### CARTER H. HARRISON, Mayor,

*v.*

### THE PEOPLE *ex rel.* John Boetter.

*Opinion filed February 21, 1902—Rehearing denied April 5, 1902.*

1. DRAM-SHOPS—*what necessary to entitle party to license after annexation of village to city.* If a city council, after annexing a village, adopts a general ordinance relating to dram-shops, and authorizes the mayor to issue licenses upon compliance by the applicant with the terms of the general ordinance and the ordinances of the former village remaining in force, compliance with such ordinances is all that is necessary to entitle an applicant to receive a license.

2. SAME—*when ordinance requiring frontage consent is not complied with.* An application for license to keep a dram-shop, which is required by ordinance to be signed "by a majority of the property owners according to the frontage on both sides of the street in the block upon which such dram-shop is to be kept," must be signed by a majority of the property owners according to frontage upon both sides of each street surrounding the block in which the dram-shop is to be kept.

3. WORDS AND PHRASES—*the word "block" is synonymous with word "square."* The word "block," as used with reference to subdivisions of land, is synonymous with the word "square," and means the territory bounded by four streets.

4. ORDINANCES—*court will avoid a construction which leads to an absurdity.* If the literal enforcement of a statute or ordinance would cause great injustice and lead to absurd consequences, courts will adopt a construction which will promote the ends of justice and avoid the absurdity.

5. SAME—*city is not bound to abide by previous improper construction of ordinance.* The fact that a city has improperly issued licenses to keep dram-shops by reason of a mistaken construction of an ordinance, does not bind it to grant licenses on the same terms to others who, under a correct construction of the ordinance, have not complied with its requirements.

*Harrison* v. *People*, 97 Ill. App. 421, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. M. KAVANAGH, Judge, presiding.

CHARLES M. WALKER, Corporation Counsel, and COLIN C. H. FYFFE, (CHURCH, McMURDY & SHERMAN, of counsel,) for appellant.

WINSTON, BABCOCK, STRAWN & SHAW, (FREDERICK R. BABCOCK, and SILAS H. STRAWN, of counsel,) for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

This is a petition filed by John Boetter in the superior court of Cook county for a writ of *mandamus* against Carter H. Harrison, mayor of the city of Chicago, to require him to issue to the relator a license to keep a dram-shop at Nos. 887-897 East Fifty-first street, in the city of Chicago, for the year ending April 30, 1901. The premises are known as the "Germania Garden," and are situated upon an unsubdivided block of land bounded on the south by Fifty-first street, on the east by Grand boulevard, on the north by Fiftieth street and on the west

by Calumet avenue. The garden fronts south, has its main entrance upon Fifty-first street, is bounded on the west by an alley running north and south through the center of the block, and on the east by a fence about twenty-six feet west of the west line of Grand boulevard, and extends north of Fifty-first street about three hundred feet, and is located in that part of the city of Chicago which was formerly the village of Hyde Park, but outside of the prohibition district thereof. An answer and replication having been filed and a jury waived, a trial was had before the court, and a judgment was rendered against the respondent, awarding the writ as prayed, from which judgment an appeal was perfected to the Appellate Court for the First District, where the judgment was affirmed, and a further appeal has been taken to this court.

The assignment of error chiefly relied upon in the Appellate Court and renewed herein is, that the court below refused to hold as law certain propositions submitted on behalf of the appellant.

It is urged that the mayor has no power or authority to issue a license to keep a dram-shop within the territory formerly within the village of Hyde Park until such license has been granted by the city council. The village of Hyde Park was annexed to and became a part of the city of Chicago upon June 29, 1889. Immediately upon the annexation of the village of Hyde Park the territory therein embraced became a part of the city of Chicago, and the power and authority before that time vested in the president and board of trustees of said village were thereafter vested in the mayor and city council of the city of Chicago, and the city council having adopted a general ordinance prescribing a general rule by which licenses to keep dram-shops might be obtained, and having authorized the mayor to issue the same upon compliance with said general ordinance and those remaining in force in annexed territory, it exhausted its power over

the subject, as it had power to act upon the subject by general ordinance alone, and not by resolution. If, therefore, the relator has complied with the ordinances of the city and those remaining in force in such annexed territory, he is entitled to a license to keep a dram-shop, and it was the duty of the mayor to issue the same to him. The main question, therefore, which arises upon this record for decision is, has the relator shown a full compliance with said ordinances and fully brought himself within the provisions thereof by his application.

Section 1 of an ordinance passed by the village of Hyde Park, and now in force in that territory, is as follows: "Any person who shall desire to obtain a license to keep a saloon or dram-shop, shall, in addition to the requirements now provided by ordinance, present his application, in writing, to the village comptroller for such license, in which shall be stated the name of the person or firm to whom the license is to be issued and the place where such saloon or dram-shop is to be kept, which application shall be signed by a majority of the property owners according to the frontage on both sides of the street in the block upon which such dram-shop is to be kept, and shall also be signed by a majority of the *bona fide* householders and persons or firms living or doing business on each side of the street in the block upon which such dram-shop shall have its main entrance."

Before a license to keep a dram-shop could lawfully be issued to the relator, said section requires that his application therefor be signed by two classes of persons: First, by a majority of all the property owners according to the frontage on both sides of the street in the block upon which such dram-shop is to be kept; and secondly, by a majority of the *bona fide* householders and persons or firms living or doing business on each side of the street in the block upon which said dram-shop shall have its main entrance. The second provision, it is conceded, has been fully complied with, and need not

be here considered. The first, however, has not been complied with, unless the signing by a majority of the property owners according to frontage upon both sides of Fifty-first street is all the signatures to the application that the ordinance requires, as the application is not signed by any of the property owners upon either side of the street, on either Grand boulevard, Fiftieth street or Calumet avenue.

The holdings of the trial and Appellate Courts were to the effect that the application, to entitle the relator to a license, need not be signed by property owners other than those owning property on both sides of Fifty-first street, and that the application being signed by a majority of the property owners according to frontage upon each side of Fifty-first street from Calumet avenue to Grand boulevard was all that the ordinance required, and a full compliance with the terms thereof to entitle the relator to a license. We do not agree with such holdings, but are of the opinion that to entitle relator to a license to keep a dram-shop he should have had his application signed by a majority of the property owners upon both sides of Grand boulevard, Fiftieth street and Calumet avenue adjoining said block, in addition to those on Fifty-first street, and that from lack of such signers to the application the mayor properly declined to issue a license to the relator. The word "block," as used in the ordinance, is synonymous with the word "square," and means the territory bounded by four streets. The word "block" is defined by the Century Dictionary and Webster as "a square or portion of a city enclosed by streets, whether occupied by buildings or not." In *Ottawa* v. *Barney,* 10 Kan. 270, Mr. Justice Brewer, in referring to the above definition, said: "We are well satisfied with the definition, and taking it as our guide in this decision, it follows, as a matter of course, that the word 'square' used by the complainant is synonymous with the word 'block.'" In *Olson* v. *Topeka,* 42 Kan. 712, the question

arose again, and in that case the court, affirming its former decision, said, although a square be cut into blocks by an alley running through it, yet these blocks are not, in fact, to be considered blocks, as that term is synonymous with "squares." In *State* v. *Deffes*, 44 La. Ann. 164, the Supreme Court of Louisiana had under consideration a statute which provided that "no private market shall be established within a walking distance of six blocks from any public market," etc., the court held that the word "blocks" had the same meaning as "squares;" that the terms were interchangeable, and meant squares of the ordinary size.

This court has several times used the work "block" as synonymous with the word "square." In *Todd* v. *Kankakee and Illinois River Railroad Co.* 78 Ill. 530, it was held that where a town has been laid out into blocks and streets for many years, and the same have always been recognized, treated and dealt with by the owners and the people as blocks and streets, said blocks should be treated as distinct tracts of land, and that a block in a city is a part of the city enclosed by streets, whether occupied by buildings or composed of vacant lots. In *City of Chicago* v. *Stratton*, 162 Ill. 494, it was said (p. 501): "As cities are constructed, the division of the territory is into blocks bounded by streets."

In construing ordinances, no less than statutes, all general provisions, terms, phrases and expressions should be liberally construed, in order that their true intent and meaning may be fully carried out; and where great inconvenience or absurd consequences would result from a particular construction, that construction should be avoided, if possible. (*People* v. *Harrison*, 191 Ill. 257.) The persons who will be injuriously affected by a dram-shop are not those, alone, who own property or reside or are engaged in business upon the street upon which it has its main entrance, but it directly affects the character and value of all the property in the block where it is located.

This case, in principle, is very much like the cases of *City of Chicago* v. *Stratton*, 162 Ill. 494, and *Martens* v. *People*, 186 id. 314. In the *Stratton case* the ordinance provided that it should not be lawful to locate in any block in which two-thirds of the buildings were devoted to exclusive residence purposes, a livery stable, "unless the owners of a majority of the lots in such block fronting or abutting on the street consent, in writing, to the location or construction of such livery stable." In considering this provision we said (p. 503): "In determining the question of the location of a livery stable the common council may properly consult the wishes and ascertain the needs of the residents of the block where the stable is to be kept, and to that end make their written consent the basis of the action of the commissioner of buildings in issuing the permit. In matters of purely local concern the parties immediately interested may fairly be supposed to be more competent to judge of their needs than any central authority." In the *Martens case* an ordinance was held valid which provided that a saloon should not be established in a block where no saloon then existed, unless the application should be accompanied by a petition signed by two-thirds of the freeholders in such block praying that such license be issued, and a license issued without such petition was held void.

These cases were based mainly on the principle that the persons who were likely to be injuriously affected, by a livery stable in the one instance and a dram-shop in the other, were those persons who owned property in the block where it was to be kept. To hold, under the ordinance in question, that the consent required was only from the property owners on each side of the street on which the dram-shop is kept, instead of on each side of the streets surrounding the block in which the dram-shop is to be kept, would manifestly lead to absurd results. By constructing a high board fence twenty-six feet back from the west line of Grand boulevard it is said the

saloon is not to be kept upon Grand boulevard but upon Fifty-first street, and therefore the consent of the property owners located upon Grand boulevard is not necessary. If that contention be true, then by constructing a high board fence twenty-six feet back from the north line of Fifty-first street and entering the dram-shop from the west through the ally, it would not be constructed upon Fifty-first street, and therefore the consent of the property owners upon that street would not be necessary. We would therefore have a dram-shop located in territory where said ordinance is in force without requiring the consent of any property owner,—in other words, by construction we would entirely abrogate and set aside the ordinance. When the literal enforcement of a statute would result in great inconvenience and cause great injustice, and lead to consequences which are absurd and which the legislature could not have contemplated, the courts will presume that such consequences were not intended, and adopt a construction which will promote the ends of justice and avoid the absurdity. *Bryan* v. *Buckmaster*, Breese, 408; *People* v. *Marshall*, 1 Gilm. 672; *People* v. *Harrison, supra.*

It is stated that the city council have heretofore construed the ordinance in question according to the construction now placed thereon by appellee, and it is urged that by reason of such fact the city is bound by such construction. We do not agree with such contention. In *People* v. *Village of Crotty*, 93 Ill. 180, which was an application for *mandamus* to compel respondent to issue a license to the relator to keep a dram-shop and pool table, on page 190 it is said: "It is no answer to what we have here said, that appellee issued licenses to others under the same circumstances that it refused them to appellant, nor is it material that it may have placed its refusal to issue them to appellant upon an improper ground. The fact that appellee may have improperly issued licenses to others by reason of a want of authority to do so, could

afford no possible reason why it should issue them to appellant, and if appellee had no right to issue them it was wholly immaterial upon what ground it placed its refusal."

We are of the opinion that appellee failed to show by his petition a right to the relief sought. The judgments of the superior and Appellate Courts will therefore be reversed.

*Judgment reversed.*