# Joseph Theurer v. The People, etc.

## Gen. No. 11,096.

1. DRAM-SHOP LICENSE—*how far issuance of, conclusive.* The action of the mayor in passing upon the sufficiency of an application for a dram-shop license and in issuing the same, is not final, and the validity thereof may be tested by information in the nature of a *quo warranto.*

2. PARK COMMISSIONERS—*nature of title held by.* The park commissioners of a public park are the holders of the fee of such park, but the usufruct is in the public.

3. PARK FRONTAGE—*to be counted in determining the validity of application for dram-shop license.* Such frontage is properly to be counted in determining whether a petition for a dram-shop license contains the requisite amount of signatures, notwithstanding such commissioners may not have power to give frontage consent. (So held by one judge, another expressing no opinion, and the third not participating in the decision.)

4. FRONTAGE CONSENT—*power to revoke.* It is within the power of a property owner at any time before the application for a dram-shop license has been finally passed upon to revoke his frontage consent.

Information in nature of *quo warranto* to test validity of dram-shop license. Appeal from the Circuit Court of Cook County; the Hon. FRANK BAKER, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1903. Affirmed. Opinion filed April 22, 1904.

JAMES J. KELLEY, for appellant.

CHARLES S. DENEEN, State's Attorney, and CHURCH, MC-MURDY & SHERMAN, for appellee.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

This is an information in the nature of a *quo warranto* to test the validity of a dram-shop license issued to appellant by the mayor and city council of Chicago. The dram-shop in controversy is situated in that portion of the city, formerly a part of the village of Hyde Park. Ordinances relating to dram-shops which were operative in that village at the time of its annexation to the city, are continued in force by the annexation act. Under those ordinances any person who shall desire to obtain a dram-shop license in

territory which, as in this case, is outside of a prohibited district, is required to present his application in writing, which shall be signed by a "majority of the property owners according to frontage on both sides of the street in the block upon which such dram-shop is to be kept, and shall also be signed by a majority of the *bona fide* householders and persons or firms living in or doing business on each side of the street in the block upon which such dram-shop shall have its main entrance." Hyde Park ordinance of April 4, 1889. It is necessary under this ordinance for the applicant to procure the signature of a majority of the property owners on both sides of the street surrounding the block or "square." Harrison v. The People, 195 Ill. 466–470. The question here presented is whether appellant complied with these requirements. A jury having been waived, the Circuit Court found the issues in favor of appellee and entered judgment of ouster.

The premises for which the dram-shop license in controversy is sought are located in the block bounded by 51st street on the south, Cottage Grove avenue on the east, 50th court on the north and Champlain avenue on the west, and are known as the "Edelweiss Gardens." Opposite the block where the proposed dram-shop is located across 51st street is Washington Park. There is also opposite that block a strip about eighty feet wide on the east side of Cottage Grove avenue belonging to the same park system under control of the South Park Commissioners. It is insisted in behalf of the appellant that decision and action of the mayor upon the application is final unless impeached for fraud; that the South Park Commissioners are not property owners within the meaning of the ordinance; that the payment of money for signatures to the application for a license to keep a dram-shop does not invalidate the signatures, and that after the application for a license is presented to the mayor and city council, one who signed it cannot revoke his consent.

The objection that the mayor's action in passing upon the sufficiency of the application is final, we cannot concur in.

The statute provides for a direct inquiry to try the right of any person claiming to hold a license issued improperly or without warrant of law in a proceeding like this, and the validity of a license to keep a dram-shop may be tested by an information in the nature of a *quo warranto*. R. S. chap. 112, sec. 1; Martens v. The People, 186 Ill. 314–316.

Although in the view we take it is not necessary for us to consider at length whether the park property should be excluded in computing the frontage required by the ordinance, yet if it should not be excluded the application was not valid. The requirement of the ordinance is that the application "shall be signed by a majority of the property owners according to frontage on both sides of the street." Appellant's contention is that the South Park Commissioners are not "owners" of the park lands within the meaning of the ordinance; that public property cannot be counted; that the word "owners" means the holder of the fee; that the park commissioners are not such owners, but hold the park property as trustees for the public, and that power to sign such an application is not conferred upon them by their charter. The park commissioners do, however, "hold the fee," although "the usufruct is in the public." The People v. Salamon, 51 Ill. 37–52. Their ownership is not unlike that of a city in public streets where, under our statute, "the fee of the streets is in the corporation and the dominion over them is as absolute as that of the owner of other lands." C. & V. R. R. Co. v. The People, 92 Ill. 170–174. In Dexter v. Sprague, 22 Rhode Island 324, a case involving the question whether park lands are rightly included in computing the land entitled to object to granting a liquor license, the court says: "The city has control of the park in a different way and to a greater extent than it has" (under the Rhode Island statute) "control of a highway. As a public resort the city has a peculiar interest in the surroundings of the park, and clearly should have the right to object to the locating of liquor saloons in its vicinity. We are, therefore, of opinion that it has the rights of an owner and occupant under this statute."

In Paterson & Passaic H. R. Co. v. Mayor, 24 New Jersey Eq. 158, it is held that the city is an owner—within the meaning of an act giving power to the railway company to lay its railway in a street on condition of obtaining permission of a majority of the owners of property fronting thereon—of land dedicated "to be an open public square or common forever." But it is argued that under their charter the South Park Commissioners "could not sign an application of any person for a dram-shop license for premises outside of the park," and that the ordinance of April 4, 1889, could not enlarge their powers in this respect. If, however, it were conceded that they do not possess that power, such fact would have no material bearing upon the question whether the park frontage must be included in the computation to determine whether an application has been "signed by a majority of the property owners according to frontage on both sides of the street in the block upon which such dram-shop is to be kept." It may nevertheless be questioned whether such power is not included in the provision that the land "shall be held, managed and controlled by them as a public park for the recreation, health and benefit of the public," subject to such necessary rules and regulations as the commissioners may adopt "for the well ordering and governing of the same." It might very well be considered that if for such well ordering and governing the commissioners deemed it proper to refuse consent to licensing a dram-shop on the border of the park, such action would not exceed their charter powers. But it is of no consequence whether the signature of the park commissioners can or cannot be obtained to such an application. There may be private owners who, by reason of mental or other incapacity, are unable to give a valid signature. The writer is of opinion the Circuit Court was correct in holding that the park frontage should be counted under the requirements of the ordinance.

It is contended that the trial court erred in refusing certain propositions of law. One of these was to the effect that "a person who signed as an abutting property

owner, the application for the dram-shop license to the respondent herein, could not revoke his signature to said application after said application had been presented to the mayor of the city of Chicago for his action, and while the same was under consideration by said mayor." One of the signers to the application who owns, it is said, 280 feet of the frontage required, filed a revocation of his signature and consent to the license, by a written instrument, July 22, 1902. This was more than a month after the application had been presented to the mayor, but was about ten days before the final action was taken and the license issued. The application was filed May 29. On June 9, and subsequently, appellant filed additional frontage consents. While the matter was under consideration the mayor invited the Hyde Park Protective Association, which was objecting to the validity of the application, to verify the signatures. About the 20th of June the mayor seems to have consented that appellant might open the dram-shop, subject, however, to the revocation of such provisional consent if evidence should meanwhile be produced sufficient under the law, in the mayor's judgment, to invalidate the application. Final action was not taken until July 30, 1902, when the license was issued. Appellant's contention is that the 280 feet of frontage included in the revocation by the said property owner, filed July 22, should still be counted in his favor because the revocation was not filed until after the mayor had given permission for the dram-shop to open pending his further consideration of appellant's right to a license. If the revocation by the property owner was effective the application was lacking in the requisite frontage signatures when the license was issued. In Little v. Board of Supervisors, 198 Ill. 205, the question of the right of petitioners for the organization of a new township to withdraw their names so as to leave the petition with a less number than required by the statute, thereby defeating the organization, was presented. The court, by Mr. Justice Wilkin, says: " Our examination of the decisions cited by counsel on either side from other

courts on analogous statutes has led us to the conclusion that the act of signing such petitions is not an irrevocable act, and that it may be revoked at any time before the jurisdiction of the body authorized to act has been determined by it." The conclusion in that case is that " to absolutely prohibit a citizen from withdrawing his name from a petition voluntarily signed by him at any time after it has been presented to a body authorized to act upon it, would be a harsh and unreasonable rule and also liable to work great hardship." These views seem to be decisive of the question presented in the case at bar. To the same effect are Lalonde v. Supervisors, 80 Wis. 385; State v. Eggleston, 34 Kans. 72; Dutton v. Hanover, 42 O. St. 217; Slingerland v. Norton, 59 Minn. 357; State v. Commissioners, 66 Minn. 534.

In view of the conclusion stated we deem it unnecessary to consider other questions discussed in the briefs of counsel. The judgment of the Circuit Court must be affirmed.

*Affirmed.*

Mr. Justice STEIN expresses no opinion as to the necessity of including park frontage.

Mr. Justice BAKER having presided at the hearing of this cause in the trial court, did not participate in the foregoing decision.