JOSEPH THEURER

*v.*

THE PEOPLE *ex rel.* Charles S. Deneen.

*Opinion filed October 24, 1904.*

1. DRAM-SHOPS—*park frontage must be counted in estimating frontage.* Park frontage bordering upon the street where a dram-shop is proposed to be opened must be included in estimating total frontage under an ordinance requiring consent of a majority of the property owners according to frontage.

2. SAME—*board of park commissioners is a "property owner" as respects frontage consent.* The board of park commissioners, for the purpose of consenting or refusing to give consent to the granting of a license to open a dram-shop upon a street on which the park abuts, is a property owner, within the meaning of an ordinance requiring consent of property owners according to frontage.

3. SAME—*the frontage cannot be counted if consent is paid for.* Frontage signed for by an owner of property to aid the applicant for a dram-shop license to secure sufficient frontage consents cannot be lawfully counted as signed for if the consent to sign was procured by paying the owner money or other valuable consideration.

4. SAME—*property owner may withdraw consent before final action.* A property owner who has signed an application for a dram-shop license has a right to withdraw his consent at any time before the tribunal created by law to determine the matter submitted by the application has finally acted.

5. SAME—*frontage may be signed for by an authorized agent.* Frontage consents may be signed by authorized agents of the owners of the property signed for.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

JAMES J. KELLY, for appellant.

CHARLES S. DENEEN, State's Attorney, (CHURCH, McMURDY & SHERMAN, of counsel,) for appellee.

Mr. JUSTICE HAND delivered the opinion of the court:

This was an information in the nature of a *quo warranto,* filed by the State's attorney of Cook county against Joseph Theurer, to test the validity of a dram-shop license issued by the mayor of Chicago, under which said Joseph Theurer was carrying on a saloon known as the Edelweiss Garden, at No. 5052 Cottage Grove avenue, in said city. A plea and replication were filed, and by agreement the case was tried by the court without a jury, which resulted in a judgment of ouster, which judgment has been affirmed by the Branch Appellate Court for the First District, and Joseph Theurer has prosecuted an appeal to this court.

The premises where the saloon was kept are located outside of the prohibition district in that part of the city which was formerly a portion of the village of Hyde Park, and under the ordinances of said village remaining in force after annexation, as construed by this court in *Harrison* v. *People,* 195 Ill. 466, it was necessary that a majority of the property owners upon both sides of the four streets surrounding the block in which the saloon was to be kept, also a majority of the *bona fide* householders and persons or firms living in or doing business on each side of the street in the block upon which the saloon shall have its main entrance, should sign an application in writing for said dram-shop license, and the question here presented for decision is, was said application signed by the requisite number of owners of property upon the several streets surrounding the block in which said saloon was to be kept?

There are 4640.19 feet of frontage on both sides of the four streets which surround the block in which said saloon was to be kept, the owners of 1957.34 feet of which signed the application. Included in said 4640.19 feet of frontage are 80 feet of frontage located upon the east side of Cottage Grove avenue and 905.35 feet of frontage on Fifty-first street, which form a part of Washington Park and are under the control of the South Park commissioners, and the con-

tention is made by appellant that that portion of said frontage should not be counted in determining the amount of frontage, the signatures of the majority of the owners of which was necessary to the application before a dram-shop license could lawfully issue. The ordinance provides the "application shall be signed by a majority of the property owners, according to frontage, on both sides of the street in the block," etc. It is clear, we think, that all the frontage on both sides of the street in the block must be counted in determining the amount of frontage for which signatures must be obtained.

It is said, however, that the park commissioners have no legal right to sign for the park frontage, and it is urged for that reason that frontage should be eliminated in determining the number of feet of frontage for which signatures of a majority must be obtained. If the contention of appellant that said commissioners have no power to sign for said property be conceded to be sound, we do not think it follows that the park frontage should not be considered in determining the amount of frontage for which signatures must be obtained. If a portion of the frontage belonged to a minor or a luhatic, such owner would have no legal right to sign the application for a dram-shop license by reason of his minority or mental incapacity, but because of his nonage or insanity his frontage could not lawfully be eliminated from the total amount of frontage upon the four streets surrounding the block in which the dram-shop was to be kept but would be required to be considered. So, here, the park frontage must be taken into consideration in determining the amount of frontage for which the signatures of owners must be obtained.

We do not, however, think the contention correct that the park commissioners have no legal power to sign for the park frontage. The legal title to all park lands is in the commissioners. In *People* v. *Salomon,* 51 Ill. 37, it was said (p. 52) : "It is argued that this park property belongs to these commissioners as a corporation. This is so by the terms of the act. They hold the fee, but the usufruct is in

the public; but holding it, they hold it as a public corporation for public purposes." The park board was created by an act of the legislature approved February 24, 1869, as amended April 26, 1869, by which it is provided that all lands acquired by said commissioners shall be held, managed and controlled by them and their successors as a public park, for the recreation, health and benefit of the public, free to all persons forever; and it is also provided they shall have full and exclusive power to govern and manage said park, to lay out and regulate the same, to pass ordinances for the regulation and government thereof, and that said commissioners shall possess all the power and authority over said park now by law conferred upon the city council of the city of Chicago in respect to public squares and places in said city. The powers thus conferred upon said commissioners over the real estate of the park, it will be observed, are very broad. It is the duty of the commissioners to improve and beautify said lands and to make the park a safe and pleasant place for the resort of the entire community, and it is not unreasonable to hold that they are interested in protecting the park and the public who resort thereto from surroundings which may be unwholesome, obnoxious or dangerous.

In *Dexter* v. *Sprague*, 22 R. I. 324, a statute provided that no license for the sale of liquor should be granted where objections were filed by the owners or occupants of the greater part of the land within two hundred feet of the place for which license was asked. It was held that the city of Providence was the owner or occupant of Roger Williams Park within the meaning of that statute. The court said: "Its control of the park for the purposes of this act was as complete as that of any owner of land. As a public resort the city has a peculiar interest in the surroundings of the park, and clearly should have the right to object to the locating of liquor saloons in the vicinity."

In *Paterson Railroad Co.* v. *Mayor*, 24 N. J. Eq. 158, the statute required that parties seeking to lay a railway in any street should first obtain permission, for the purpose, of

a majority of the owners of property fronting on the streets or avenues through which they proposed to lay the railway and also of the mayor and aldermen of the city. A public park fronted on the route of the proposed road. It had been dedicated to public use by its previous owners, to be an open or public square or common forever, and was within the control of the city and the city authorities. The city had passed an ordinance authorizing the laying of the tracks, and it was held that this operated as an expression of its consent both as a municipal authority and as owner of the park. The court said: "The legislature, in thus requiring the consent of the majority of the property owners, intended merely to make it a matter of choice with them whether the railroad should be laid or not. The city, in reference to the square, is an owner, within the meaning of the act. It is the duty of the city authorities, and they are the proper persons, to judge as to whether the railway in the street would be prejudicial to the public property or otherwise,—and that, too, in regard to property dedicated to public use as well as to public property the fee whereof is in the corporation."

We think it clear that the South Park commissioners, for the purpose of giving consent to the granting of a dram-shop license authorizing the keeping of a saloon upon property abutting upon a street which adjoins park property, is an owner, within the meaning of said ordinance, and that the park frontage upon Cottage Grove avenue and Fifty-first street must be considered in determining whether the application filed by the appellant was signed by a majority of the property owners, according to frontage, upon the four streets surrounding the block in which the said dram-shop was to be kept.

It appears from the record that Thomas Conlin, one of the signers of the application, owned 208.4 feet of vacant property across the street from said saloon, fronting upon Cottage Grove avenue; that he had filed a protest with the mayor against the granting of a license to run a dram-shop at No. 5052 Cottage Grove avenue; that on May 13, 1902,

he leased his property to the appellant for $1500 per year, the payment being conditioned upon the fact that a dram-shop license be issued for No. 5052 Cottage Grove avenue to the lessee or to any person nominated by him, and the lessor agreed to sign an application for a dram-shop license to be carried on at that place. The evidence shows one year's rent to have been paid. It also appears that Norman Cummings signed the application, as owner, for 52.90 feet frontage, and his daughter, Cora C. Willett, as owner of 248 feet frontage, for which signatures Cummings was paid by appellant the sum of $1000, and it is contended by the appellee that the frontage signed for by Thomas Conlin, Norman· Cummings and Cora C. Willett, which aggregates 509.3 feet, should not be counted in determining the sufficiency of said application, as the signatures for said frontage were purchased. It is not entirely clear from the evidence whether the $1000 paid to Cummings was paid for his signature alone or for that of himself and his daughter, but we think the inference to be drawn from the evidence is, that they both were to sign the application in consideration of the payment to Cummings of that sum. As to the lease made by Thomas Conlin to the appellant for the Cottage Grove frontage across the street from the saloon, we think it clear the $1500 per annum designated as rent was paid to Conlin for his signature to the application, as immediately upon the lease being closed he withdrew, in writing, the protest before that time filed by him with the mayor and signed an application for a dram-shop license to carry on a saloon at No. 5052 Cottage Grove avenue. The question, therefore, is squarely raised whether the owner's consent, evidenced by his signature to the written application for the issuance of a dram-shop license, as provided by said ordinances, can be purchased and be valid.

In *People* v. *Griesbach,* 211 Ill. 35, the question presented for consideration was the validity of the signature of a minor to an application for a dram-shop license under the said ordinance, and it was held that a property owner, in

determining whether he would sign the application for a dram-shop license, acted not alone for himself, but for third persons and the general public, and that a minor, by reason of his nonage, was not qualified to sign the application. In considering the question then before the court, expression was given to the following views: "The provisions in statutes and ordinances requiring the consent or recommendation of designated persons in the vicinity of the place where a license to sell intoxicating liquors is desired to be authorized have uniformly been held to be valid. (*City of Chicago* v. *Stratton,* 162 Ill. 494; *Swift* v. *People,* 162 id. 534; 17 Am. & Eng. Ency. of Law,—2d ed.—211.) Such provisions are in recognition of the legislative view that the peace, good morals, order and safety of the community may be affected by the grant of a license to sell intoxicating liquors, and that the general public in the vicinity of the place of the proposed establishment of a dram-shop are for that reason interested in the question whether a license therefor shall be granted or refused. Those persons who are invested by such statutes or ordinances with the power to endorse or refuse to endorse the application for a license to keep a dram-shop are charged, in a degree, with a duty to the public. The determination of the propriety of signing or refusing to sign such an application demands consideration not only of the views and interests of the person so having legal qualifications to join in the application, but also the consideration of the rights and interests of third persons and of the general public in the vicinity. The action to be taken is not wholly in his private and personal capacity, but he must act to some extent in a public capacity. He is entrusted with a power the exercise whereof concerns the welfare of the public, and he therefore has a duty to discharge to his neighbors and other members of the community whose interests, rights, morals and safety are concerned and may be affected by his act."

If the legislative power, instead of providing that the license should be issued upon the written application of a majority of the property owners, according to frontage, had

provided the question of issuing the dram-shop license should be decided at an election by the property owners within the same district, would it be contended that the applicant for a license lawfully might control the result of the election by purchasing votes? We apprehend not. In *Doane* v. *Chicago City Railway Co.* 160 Ill. 22, it was held that the consent of the property owner obtained by purchase to the laying of a street railroad track in a public street in front of his property was void, on the ground that to so obtain such consent was contrary to public policy. On page 31 it was said: "The question then arises whether the consent of a property owner to the laying down of a street railway in the street upon which his property abuts can be purchased for money or for a consideration inuring to the exclusive benefit of such owner. We do not think that it was the intention of the legislature, in the adoption of paragraph 90 as above quoted, to make the consent of the abutting owner in such cases a purchasable article. An agreement based upon the purchase of the abutting owner's consent to the laying of the proposed tracks in a public street is illegal, as being against public policy, and will not be enforced by the courts."

In view of what was said by this court in the *Griesbach case* and the *Doane case,* we think it clear that frontage signed for by the owner of property abutting upon a street surrounding a block in which a dram-shop is sought to be licensed cannot lawfully be counted if the consent of the owner to sign the application was procured by paying to him money or other valuable considerations inuring to his benefit.

William M. Alister signed for 280 feet of frontage, but on July 22, 1902, he withdrew his name from the application. The right of a petitioner to withdraw his name from a petition at any time prior to the time the tribunal created by law to pass upon and determine the proposition submitted by the petition has finally acted is settled by this court in *Littell* v. *Board of Supervisors,* 198 Ill. 205. The petition in that case was filed under the act of 1895 for the creation of a new town. The court, on page 208, said: "Our examina-

tion of the decisions cited by counsel on either side from other courts on analogous statutes has led us to the conclusion that the act of signing such petition is not an irrevocable act, and that it may be revoked at any time before the jurisdiction of the body authorized to act has been determined by it. * * * To absolutely prohibit a citizen from withdrawing his name from a petition voluntarily signed by him, at any time after it has been presented to a body authorized to act upon it, would be a harsh and unreasonable rule and also liable to work great hardship. Generally, parties act from honest motives, and it is for the protection of the rights of such parties that laws are enacted and construed." The conclusion reached by the court in that case is supported by many decisions of other courts, and we think is in accord with the great weight of authority.

In *LaLonde* v. *Board of Supervisors,* 80 Wis. 380, a signer of a petition for the removal of the county seat sought to withdraw his name before the petition was finally acted upon by the board of supervisors, which right was affirmed by the circuit court. The Supreme Court, on page 385, said: "Was that a correct view of the matter? We think it was, and that it was in accord with reason and common sense, for what valid objection is there, either in law or on grounds of public policy, against allowing a person who has signed a petition asking for a removal of the county seat, from withdrawing his name from the petition before it is acted upon by the board? As the learned counsel for the defendants say, a person may have been deceived or entrapped, or through inadvertence or thoughtlessness may have signed such a petition, and on reflection, and before action is taken on it, may desire to correct his action and withdraw his name. Why should he not have the right and privilege of doing so? An intelligent man, acting deliberately and understandingly, may change his mind on such a question and conclude he has made a mistake in asking for a change of the county seat, and that the public interest will be promoted by having the county seat remain where it is."

In *Slingerland* v. *Norton,* 59 Minn. 351, also a county seat case, the Supreme Court of Minnesota said (p. 357) : "We have no doubt of the right of any of the signers to withdraw his name from the petition at any time before the board of county commissioners has completed its inquiry and determination in the matter of purging the petition committed to it by the statute. This right is an absolute one, which the petitioner may exercise on his own motion, without assigning any reason therefor or obtaining leave to do so from anyone."

We see no difference, in principle, between the foregoing cases and the one at bar. The application was filed May 29. On June 9, and subsequently, appellant filed additional frontage consents. While the matter was under consideration the mayor invited the Hyde Park Protective Association to verify the signatures. On June 20 the mayor consented that appellant might open the dram-shop, subject, however, to the revocation of such provisional consent if evidence should meanwhile be produced sufficient under the law, in the mayor's judgment, to invalidate the application. Final action was not taken until July 30, 1902, when the license was issued. William M. Alister therefore withdrew his signature before the mayor had finally determined to issue a dram-shop license. The frontage owned by him should not, therefore, be counted.

The record shows that Peter Wolff signed the application for S. W. Heiss for 52.90 feet frontage, and that Leo Hettich signed for his wife, Mary Hettich, for 19.50 feet frontage, and it is urged said frontage should not be counted, on the ground that the application must be signed by the property owner in person. This court is committed to the doctrine that property frontage consents may be signed by an authorized agent. *Thorn* v. *West Chicago Park Comrs.* 130 Ill. 594; *Tibbetts* v. *West and South Towns Street Railway Co.* 153 id. 147; *Merritt* v. *City of Kewanee,* 175 id. 537; *McVey* v. *City of Danville,* 188 id. 428.

As it is clear the application was not signed by the owners of a majority of the frontage upon both sides of the four streets surrounding the block in which No. 5052 Cottage Grove avenue is located, it is not necessary to determine the question whether, as a fact, the parties signing as agents were duly authorized to act for their alleged principals.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*