[No. 8648.   Department Two.   June 16, 1910.]

THE STATE OF WASHINGTON, *on the Relation of Paul K. Mohr, Appellant,* v. THE CITY OF SEATTLE *et al., Respondents.*[1]

MUNICIPAL CORPORATIONS—ORDINANCES—REFERENDUM—PETITION—RIGHT TO WITHDRAW NAME. A person signing a referendum petition, required to be signed by a certain percentage of the voters of a city, has the right to withdraw his name therefrom before the jurisdiction of the officer to whom it is addressed attaches; but not after final action has been taken thereon.

SAME—NUMBER OF SIGNERS—DETERMINATION. Under Seattle City Charter, art. 4, providing that a certain percentage of the voters may invoke the referendum, and that the city comptroller shall verify the sufficiency of the signatures and transmit it with his report to the city council, whose only duty is to then submit the question to the voters, the sufficiency of the signatures to the petition is to be determined by the city comptroller, and after his report is made a person signing the petition cannot withdraw his name therefrom.

SAME—SUBMISSION OF REFERENDUM—DUTY OF COUNCIL. Under art. 4, Seattle City Charter, after a sufficiency of signatures to a referendum petition has been determined by the city comptroller, the city council has no discretion in the matter except to submit the question.

SAME—ACTION TO ENFORCE REFERENDUM—PARTIES—RIGHT TO SUE. A voter and petitioner entitled to sign a referendum petition may maintain an action to compel the city council to act thereon.

Appeal from a judgment of the superior court for King county, Main, J., entered December 2, 1909, dismissing an action for an injunction, after a trial upon an agreed statement of facts.   Reversed.

*Walter S. Fulton,* for appellant.

*Scott Calhoun, J. E. Bradford, Harold Preston,* and *Hughes, McMicken, Dovell & Ramsey,* for respondents.

RUDKIN, C. J.—This action was instituted to enjoin the city of Seattle and its officers from acting under or enforcing

[1]Reported in 109 Pac. 309.

the provisions of a certain city ordinance, and to compel the
defendant city, through its mayor and city council, to sub-
mit such ordinance to the qualified voters of the city for
their approval or rejection, under the referendum provi-
sion of the city charter. The facts which gave rise to the
present controversy, so far as deemed material, are as fol-
lows: On the 27th day of July, 1908, the city council of
the city of Seattle passed Ordinance No. 19,077 entitled,
"An ordinance granting to the National District Telegraph
Company, of Seattle, its successors and assigns, the right
to establish and conduct in the city of Seattle an electrical
protection system, and to lease from other persons or cor-
porations wires or conduits for the operation of such system,
and to construct and maintain wires upon poles owned by any
corporation or person upon obtaining the consent of such
corporation or person, and to operate such system for the
assistance of the fire and police departments of the city of
Seattle;" which was not an emergency law or ordinance, with-
in the meaning of the referendum provision of the charter. On
the 10th day of August, 1908, the ordinance was vetoed by
the mayor. On the 8th day of September, 1908, the city
council passed the ordinance over the veto. On the 7th day of
October, 1908, a petition invoking the referendum was filed
with the city comptroller. On the 2d day of November, 1908,
the city comptroller verified the sufficiency of the signatures
to the petition, and transmitted the petition, together with
his report thereon, to the city council, as required by the
charter. This report showed substantially the following
facts:

"That eight per cent (8%) of the total vote cast for
mayor at the last general election, to wit, 29,581, equals
2,367.

"That said petition contains the purported signatures of
5,127 qualified voters.

"That of said 5,127 names, 3,650 names appear on the
registration books of the city for the year 1908, which num-
ber is 1,313 more than the number required by the city

charter to make it mandatory that the city council submit said ordinance No. 19,077 to a vote of the people.

"That a petition containing the purported signatures of 1,032 signers of the original referendum petition, aforesaid, has been filed with the city clerk this 2nd day of November, 1908, requesting a withdrawal of their names from said referendum petition, which said petition has not been checked."

After the referendum petition and the comptroller's report thereon had been transmitted to the city council, and before any further action was taken by that body, further petitions were filed, containing additional withdrawals from the referendum petition. Upon the receipt of the petitions containing these additional withdrawals, the city council referred the referendum petition, the comptroller's report, and withdrawal petitions to its corporation committee. The corporation committee then requested the city comptroller to compare and check over the signatures to the different petitions, with a view of ascertaining how many of the signatures to the referendum petition were also on the withdrawal petitions. The comptroller complied with this request and reported back to the committee that of the 3,680 names of qualified electors on the referendum petition, 979 withdrew their names under the withdrawal petitions filed with him and referred to in his report to the city council, and 760 additional names appeared on the withdrawal petitions filed subsequent to that report. On the report of its corporation committee, the city council determined that the referendum petition did not contain the requisite number of signatures, after deducting all withdrawals therefrom, and rejected the same.

From the foregoing statement it will be seen that the original referendum petition contained a sufficient number of signatures; that the petition was still sufficient after deducting the withdrawals made or filed before the comptroller made his report and transmitted the petition to the city council, but was insufficient if the withdrawals made or filed subse-

quent to the report of the comptroller are considered and allowed. The material provision of the city charter is the following:

"The referendum may be invoked by petition bearing the signatures of the required percentage of qualified voters as to any nonemergency law or ordinance, or any section, item or part of any such law or ordinance, which petition shall be filed with the city comptroller before the day fixed for the taking effect of the said law or ordinance, which shall in no case be less than thirty (30) days after the final favorable action thereon by the mayor and the city council, acting in their usual prescribed manner as the ordinary legislative authority of the city, and the filing of such referendum petition as to any such ordinance or section, item or part thereof, shall operate to suspend the taking effect of the same, or any further action thereon, except as hereinafter provided, viz., the city comptroller shall verify the sufficiency of the signatures to the petition and transmit it, together with his report thereon, to the city council at a regular meeting not less than (20) days after the filing of the petition. The city council shall thereupon provide for the submitting of said ordinance, section, item or part thereof. to the vote of the qualified electors for ratification or rejection, either at the next regular municipal election or at a special election as the city council in its discretion may provide." Seattle Charter, article 4.

On the foregoing facts and charter provision, two questions are presented for consideration; first, may a person who signs a petition, such as the referendum petition in this case, withdraw his name therefrom; and second, if so, how long does the right of withdrawal continue. The first question must be answered in the affirmative, for the overwhelming weight of authority sustains the right of withdrawal in such cases. The rule has been applied to withdrawals from petitions for the sale of intoxicating liquors, petitions for changing or removing county seats, petitions for the organization of turnpike companies, petitions for the establishment of public roads, petitions for public improvements, petitions for the issuance and sale of bonds, petitions for local option elec-

tions, and by this court, to a petition for the disincorpora-- tion of a town. *Green v. Smith*, 111 Iowa 183, 82 N. W. 448; *Perkins v. Henderson*, 68 Miss. 631, 9 South. 897; *State ex rel. Morgan v. Nemaha County*, 10 Neb. 32, 4 N. W. 373; *Hoffman v. Nelson*, Neb. (Unof.) 215, 95 N. W. 347; *County Court of De Kalb County v. Pogue*, 115 Ill. App. 391; affirmed on appeal, *Kinsloe v. Pogue*, 213 Ill. 302, 72 N. E. 906; *Theurer v. People*, 211 Ill. 296, 71 N. E. 997; *State ex rel. Andrews v. Boyden*, 18 S. D. 388, 100 N. W. 763; *State v. Eggleston*, 34 Kan. 714, 10 Pac. 3; *La Londe v. Board of Supr's of Barron County*, 80 Wis. 380, 49 N. W. 960; *Hord v. Elliott*, 33 Ind. 220; *Hays v. Jones*, 27 Ohio St. 218; *People ex rel. Irwin v. Sawyer*, 52 N. Y. 296; *O'Neal v. Minary*, 125 Ky. 571, 101 S. W. 951; *State v. Kellogg*, 133 Mo. App. 431, 113 S. W. 660; *State ex rel. Kaufman v. Martin* (Nev.), 103 Pac. 840; *Parish v. Collins*, 43 Wash. 392, 86 Pac. 557.

The reason for the rule is well stated in *County Court of De Kalb County v. Pogue, supra*:

"Signatures to such petitions are easily obtained. Or-- dinary experience teaches that, in matters which do not seem closely to touch themselves, many persons sign petitions. without sufficient consideration and inquiry, and if the sub- ject afterwards becomes a matter of public discussion so that their attention is carefully drawn to the reasons for that for which they have petitioned, they often then conclude that they have been hasty in signing, or are in error, or that they do not wish the petition granted. In the case before us, the signatures were purely voluntary. The signers received no consideration for joining in the petition. The petition con- tained no promise of any kind. The rule governing mutual subscriptions of money is not applicable. One signature was not a consideration for another signature. What good reason is there why one who has changed his mind since sign- ing such a petition, and who concludes that either the public good or his own interest is not in harmony with the petition, may not recede from his signature before action taken there- on? The rule which permits a withdrawal at any time be--

fore final action upon the petition is much more likely to get at the real and mature judgment of the voters, and it is calculated to discourage a hasty presentation of a petition for signatures without a full disclosure of the real merits of the question."

Of the 3,680 electors who signed the original petition in the case before us, 1,739, or almost one-half, withdrew their names, because they had signed the petition under a misapprehension as to the merits of the question involved. This shows the perfunctory ill-advised manner in which the average citizen habitually signs any petition thrust before him, and if the object of the law is to ascertain and carry out the will of the petitioners, public policy should permit and encourage those who have signed through mistake and against their better judgment to withdraw.

But, while the authorities fully sustain the right of withdrawal in such cases, they are practically agreed that the right must be exercised before the jurisdiction of the officer to whom the petition is addressed attaches, or at least before final action on the petition is taken. The respondents concede this, so that it only remains for us to consider whether the sufficiency of the signatures to the petition in question was for the determination of the city comptroller or the city council. If by the former, the withdrawals attempted after the report of the comptroller to the city council came too late, but if by the latter, the withdrawals were timely. An examination of the charter provision convinces us that the determination of that question is to be made by the city comptroller. The charter provides that that officer shall verify the sufficiency of the signatures to the petition, and imposes no duty whatever upon the city council, except to submit the question to the voters for approval or rejection, at a general or special election on the comptroller's report.

A very similar question arose in *Good v. Common Council of San Diego*, 5 Cal. App. 265, 90 Pac. 44, where the supreme court of California was called upon to construe the recall

provisions of the San Diego charter. In answer to the contention now made by the respondents, the court said:

"There is no discretion vested in the common council in connection with the calling of this election. That body's functions are purely ministerial, but, if it be conceded that it was vested with some discretion, it does not follow that it can refuse to act. The duty of determining whether or not the petition contains the proper number of signatures and the comparing of them with the great register devolved upon the city clerk. He is the person given authority to hear and determine the question of sufficiency of the petition, and no appeal therefrom is provided and none apparently intended to be given. This is evident from the provision of the act requiring the return of the petition by the city clerk to the petitioners if found insufficient, and which, in effect, negatives petitioner's right of appeal."

The respondents seek to distinguish that case from the case at bar on the ground that the court was there controlled largely by the charter provision requiring the city clerk to return the petition to the petitioners, if found insufficient, thus showing that the power of determination was vested in the city clerk and not in the common council. But the provision of the Seattle charter relating to the initiative is identical with the recall provision of the San Diego charter, and is very similar to the referendum provision before us. Both the initiative and referendum provisions of the Seattle charter provide that the city comptroller shall verify the sufficiency of the signatures to the petition. True, the former provides that if found insufficient the petition shall be returned to the principal petitioners, who are allowed twenty days additional to complete the petition to the requisite percentage, while the latter contains no provision for a return of the petition in case it is found insufficient. The reason for this difference is obvious. The time for filing petitions under the referendum expires before the comptroller makes his determination and report, and no object could be accomplished by a return of the petition, for its deficiencies cannot be thereafter supplied.

The respondents argue that the petition and the report of the comptroller are in all cases transmitted to the city council, but we do not so read the charter. It certainly contains no express provision to that effect, and the implications are all the other way. After the petition and report have been transmitted to the city council, that body has no duty or discretion in the matter, except to submit the question to a vote at a general or special election. The inference from this is that nothing but a sufficient petition shall be transmitted to the city council. In other words, the comptroller determines the sufficiency of the petition in all cases. An insufficient petition invoking the initiative is returned to the petitioners, in order that they may supply its deficiencies, while an insufficient petition invoking the referendum is *functus officio* and never leaves the comptroller's office. It may be that the action of the comptroller is not final for all purposes. Should he through fraud or mistake fail to report a sufficient petition, or through fraud or mistake report an insufficient petition, the courts would perhaps afford relief in some form, but we are not concerned with that question at this time.

It is further contended that the relator is not entitled to maintain this action, because he has no interest in the question, except as a voter and a petitioner. This question was also decided against the respondents in the *Good* case, *supra*, where the court said:

"By these charter provisions the right to petition for the removal of a public officer is vested in 'the electors entitled to vote for a successor to the incumbent sought to be removed.' This being the foundation of the right, those who are entitled to demand that the common council call the election can certainly maintain the action to protect the right granted. There is but one question, then, as to how the action must be brought. Must all the petitioners join, must one sue on behalf of himself and others, or may one sue alone? We think the authorities sustain the right of one or more of the petitioners to maintain the proceeding for a writ of mandate."

We are therefore of opinion that the action of the city council in refusing to submit the ordinance to the voters for their approval or rejection, and in acting under its provisions, is unwarranted, and the judgment is accordingly reversed, with directions to enter judgment in accordance with the prayer of the complaint.

DUNBAR, PARKER, MOUNT, and CROW, JJ., concur.