[*En Banc.*  September 21, 1914.]

[No. 12284.  Initiative Measure No. 7.  Bureau of Inspection.]

THE STATE OF WASHINGTON, *on the Relation of Lucy R. Case, Plaintiff*, v. THE SUPERIOR COURT FOR THURSTON COUNTY, CLAYPOOL, J. *et al.*, *Defendants.*

[No. 12287.  Initiative Measure No. 8.  Employment Agencies.]

THE STATE OF WASHINGTON, *on the Relation of I. M. Howell, Secretary of State, Plaintiff*, v. THE SUPERIOR COURT FOR THURSTON COUNTY, CLAYPOOL, J. *et al.*, *Defendants.*

[No. 12289.  Initiative Measure No. 9.  First Aid.]

THE STATE OF WASHINGTON, *on the Relation of E. A. Sims, Plaintiff*, v. THE SUPERIOR COURT FOR THURSTON COUNTY, MITCHELL, J. *et al.*, *Defendants.*

[No. 12285.  Initiative Measure No. 10.  Public Highways.]

THE STATE OF WASHINGTON, *on the Relation of Lucy R. Case, Plaintiff*, v. THE SUPERIOR COURT FOR THURSTON COUNTY, MITCHELL, J. *et al.*, *Defendants.*

[No. 12286.  Initiative Measure No. 12.  Tax Commission.]

THE STATE OF WASHINGTON, *on the Relation of Lucy R. Case, Plaintiff*, v. THE SUPERIOR COURT FOR THURSTON COUNTY, CLAYPOOL, J. *et al.*, *Defendants.*[1]

[Syllabus by the Reporter.]

STATUTES—INITIATION—PETITION—VALID SIGNATURES—DETERMINATION—REVIEW BY COURTS. The determination (under 3 Rem. & Bal. Code, § 4971-1 *et seq.*) of the number of valid signatures upon an

[1]Reported in 143 Pac. 461.

initiative petition to submit a measure to a vote of the people, is a political rather than a judicial question, although including an issue of fraud, in the absence of statutory provisions to the contrary; hence the legislature has power to commit the same to administrative officers, and the courts could not, in the absence of express statute, review the determination of such officers.

SAME — REVIEW BY CANVASSING OFFICERS — MINISTERIAL DUTIES. The determinations made by local officers upon questions expressly submitted to them by the law relating to the submission of initiative measures to a vote of the people cannot be reviewed by the secretary of state as a canvassing officer in the absence of express statutory authority therefor, since the duties of canvassing officers are purely ministerial and limited by the express power conferred upon local certifying officers.

SAME — DETERMINATION OF VALID SIGNATURES — REVIEW — LIMITATIONS—STATUTES—CONSTRUCTION. 3 Rem. & Bal. Code, § 4971-15, providing that, upon submission to him of initiative petitions, the secretary of state "shall proceed to canvass and count the names of certified legal voters on such petition. If he find the same name signed to more than one petition, he shall reject both names from the count," being a special authority to reject names for one reason only, suggests, almost conclusively, a limitation on his power to reject names for any other cause.

SAME—DETERMINATION OF VALID SIGNATURES—POWERS OF SECRETARY OF STATE—LIMITATIONS—STATUTES—CONSTRUCTION. 3 Rem. & Bal. Code, § 4971-12, providing that, upon an initiative petition being submitted to the secretary of state, he shall examine and file the same "if upon examination said petition appears to be in proper form and to bear the requisite number of signatures of legal voters," merely provides for a preliminary decision by the secretary as to the filing; and the fact that Id., § 4971-13 provides for a review of such preliminary decision in the courts, does not enlarge the scope of the review on an appeal from the secretary's final canvass of the signatures, so as to include in the latter review the question of the number of "signatures of legal voters," where, in the secretary's final canvass, he is only authorized to reject names if he finds the same name signed to more than one petition.

SAME—"CANVASS"—LIMITATIONS—STATUTES—CONSTRUCTION. Under 3 Rem. & Bal. Code, § 4971-15, providing that, upon submission of initiative petitions, the secretary of state shall "canvass" and count the names of certified legal voters, and if he finds the same name signed to more than one petition he shall reject both names from the count, the word "canvass," though meaning to "scrutinize, examine, and determine," does not authorize the secretary of state to do more than scrutinize and examine the petitions to determine the

number of and reject the duplicate names, that being his only express authority; and the words "canvass and count" are given full effect without finding any intent to authorize the secretary of state to decide the genuineness of the signatures, the forgery of officer's initials, the sufficiency of the certifying officer's certificates, and like questions.

SAME—DETERMINATION OF LEGAL SIGNATURES—APPEAL—NECESSITY —REVIEW—PARTIES ENTITLED TO ALLEGE ERROR. Where the secretary of state, upon his canvass of initiative petitions, rejects certain names, but accepts sufficient to put the measure on the ballot, so that his decision as a whole is in favor of the advocates of the measure, they may, on appeal by opponents of the measure, appear in the superior court in opposition to the claims of the opponents seeking reversal of the secretary's decision, without having taken an independent appeal within the five-day limit fixed by law.

SAME—DETERMINATION OF VALID SIGNATURES—LOCAL OFFICERS— CONCLUSIVENESS—REVIEW BY SECRETARY OF STATE—STATUTES—CONSTRUCTION. The secretary of state is without authority, upon the canvass of initiative petitions, to inquire into or decide whether the names signed are the "signatures of legal voters," and when a local certifying officer has decided that names upon a petition are the signatures of legal voters, and has evidenced his decision by a proper certificate, his decision is final; in view of 3 Rem. & Bal. Code, § 4971-8, providing that the person in each precinct having possession of the registration books shall certify that he has carefully compared the signatures on the foregoing petitions with said registration books, and the signatures initialed by him are the signatures of legal voters of the state; and Id., § 4971-8, providing that in precincts where registration is not required, the petition shall be certified by .a justice of the peace, road supervisor, member of a school board, or a postmaster, to the effect that he resides in the precinct, is acquainted with the legal voters thereof, and that he believes the signatures initialed by him are the signatures of legal voters of such precinct; and in view of the fact that the only authority for a review of the decisions of such local certifying officers is the provision in Id., § 4971-15, authorizing the secretary of state to canvass and count the names of certified legal voters, and "if he find the same name signed to more than one petition, he shall reject both names from the count."

SAME—DETERMINATION OF LEGAL SIGNATURES—APPEAL—REVIEW BY COURTS—STATUTES—CONSTRUCTION. 3 Rem. & Bal. Code, § 4971-17, providing that any person dissatisfied with the determination by the secretary of state that an initiative petition does or does not contain the requisite number of signatures of legal voters, may have the same submitted to the superior court by citation or writ for exam-

ination and for a writ compelling certification of the measure, or
for an injunction to prevent the same, as the case may be, to be
heard and determined by the court, does not authorize the superior
court to review the question as to requisite number of signatures of
legal voters; since the appeal was to review only errors of the secre-
tary of state and that question could not be determined by the
secretary of state, the certificate of local certifying officers being
conclusive on that subject on the courts as well as on the secretary
of state.

SAME—DETERMINATION OF LOCAL OFFICERS—CONCLUSIVENESS. The
finality of the determination of the local certifying officers is not
affected by the fact that there is no special provision of law requir·
ing such officers to return their certificate to the secretary of state.

SAME. Such finality in nonregistration precincts is not affected
by the fact that the officer is only required to certify as to his "be-
lief" that his initialed signatures were those of qualified voters.

SAME — INITIATION OF MEASURES — FRAUD AND CORRUPTION — EN-
FORCEMENT OF ACT—STATUTES—CONSTRUCTION. The fact that 3 Rem.
& Bal. Code, §§ 4971-31 and 4971-32, provide severe penalties for
forgeries, fraud, false reports and certificates, and violations of the
provisions of the law for initiation by petition of a measure to be
submitted to the vote of the people, and that by Id., § 4971-5, pro·
vides for printing a warning of these provisions on every petition
circulated, evidences an intent on the part of the legislature to
make them the only safeguards looking to the prevention of fraud,
forgery, and corruption, of this constitutional right of the people,
except as provided for the review of decisions by executive officers.

SAME—INITIATION OF MEASURES—DIRECTORY REQUIREMENTS—USE
OF INK. The provisions of 3 Rem. & Bal. Code, § 4971-10, requiring
a local certifying officer, in comparing and certifying the signatures
on an initiative petition, to place his initials "in ink opposite the
signatures of those persons shown by the registration books to be
legal voters" is directory to the extent that initialing the signatures
with a common lead pencil is a sufficient compliance with the law,
in view of the liberal construction accorded election laws, the law
not declaring a signature invalid for failure to use ink.

SAME—REQUIREMENTS—FORM OF PETITION. For the same reasons.
Id., § 4971-9, prescribing the form of the petitions, in so far as it
declares that petitions shall consist of sheets with numbered lines
for not more than twenty signatures on each sheet, is directory,
in so far as may be considered as limiting the number of signa-
tures that may be placed on any petition.

SAME—FORM OF PETITIONS—BLANK LINES—EVIDENCE OF FRAUD.
The fact that the local certifying officer initialed blank lines on such

a petition, upon which some names were signed, is not of itself such conclusive evidence of fraud on the part of the certifying officer as to authorize the rejection of the duly initialed signatures upon such a petition.

MAIN, GOSE, and CHADWICK, JJ., dissenting.

Certiorari to review judgments of the superior court for Thurston county, Mitchell and Claypool, JJ., entered September 3, 1914, upon appeals from the decisions of the secretary of state, upon canvassing the returns for the submission of initiative measures at the general election. Affirmed as to initiative measures Nos. 8, 9, and 12; reversed as to Nos. 7 and 10.

*Teats, Teats & Teats, E. G. Mills,* and *Malcolm Douglas,* for Lucy R. Case, and for I. M. Howell, secretary of state, in cause No. 12287.

*The Attorney General* and *E. W. Allen, Assistant,* for I. M. Howell, secretary of state, in all the causes.

*Kerr & McCord* and *Frank C. Owings,* for interveners and defendants in causes Nos. 12284 to 12287 inclusive, and for relator Sims in cause No. 12289.

PARKER, J.—The relators in these cases seek in this court review and reversal of the judgments of the superior court of Thurston county, rendered upon appeals from the decision of the secretary of state upon the questions of submitting to the voters of the state, at the general election of the present year, initiative measures numbered 7, 8, 9, 10, and 12, petitions for which have been filed in his office. The cases are so related in their presentation of questions that for convenience they were, by stipulation, tried at the same time, before the two trial judges for Thurston county, though each judge considered the cases assigned to his department of the trial court and rendered judgments therein separately, as if sitting alone. This resulted in Judge Claypool rendering judgments in the cases involving initiative measures numbered 7, 8, and 12, and Judge Mitchell rendering judgments in cases

involving initiative measures numbered 9 and 10. The cases come here upon separate writs of certiorari, but are all presented by one set of briefs, and have all been argued together.

The contentions of counsel relate to a number of alleged forged and fraudulent signatures upon the petitions, which, it is insisted, should be rejected as invalid signatures, and also, to alleged defects and irregularities in certifying and verifying as proper signatures a number of the names upon the petitions, which, it is insisted, should be rejected. The main problem is, Does the number of valid, properly verified signatures upon the petitions for each of these initiative measures exceed 31,836, which is conceded to be the required number to authorize the submission of initiative measures to the voters at the general election of the present year?

At its session of 1913, the legislature passed an act to facilitate the operation of our constitutional amendment adopted in 1912, relating to the initiative. Laws 1913, p. 418 (3 Rem. & Bal. Code, § 4971-1 *et seq.*). This law, interpreted in the light of the constitutional provision it was enacted to facilitate the operation of, is to guide us in the solution of the problem here presented. It prescribes the duty and power of certain specified local officers touching the verifying of names appearing upon the petitions as being the signatures of legal voters, before the filing of the petitions with the secretary of state; and also prescribes the duty and power of the secretary touching the canvass and counting of the names of certified legal voters upon the petitions, after the filing of them in his office. These respective powers and duties of the local certifying officers and the secretary it will be well to have before us at the outset, to the end that we may the more readily and without repetition note, as we proceed, not only what these respective powers are, but also how they are to be exercised independent of each other, and in the absence of prescribed revisory powers on the part of the secretary of state over the decisions of the local certifying officers touching the particular questions submitted to

them for decision. Section 5 (3 Rem. & Bal. Code, § 4971-5), of the law prescribes the form of petitions for initiative measures to be substantially followed, which are to be signed by the voters, including the form of verification attached thereto, reading as follows:

"I, the undersigned, hereby certify that I am the officer of the city (town or precinct) of........county of........, State of Washington, having the custody of the registration books containing the signatures, addresses and precincts of the registered legal voters of said city (town or precinct); that I have carefully compared the signatures on the foregoing petitions with said registration books, and the signatures on the petitions opposite which I have written my initials are the signatures of legal voters of the state of Washington.

"Dated the......day of.........., 19....

.........................

"(Seal)   of the city (town or precinct) of

.........................

"By ..............Deputy."

This form, it will be noticed, applies only to petitions signed by voters residing in precincts where there is registration of voters. For certification of petitions signed by voters residing in precincts where there is no registration of voters, § 8 of the law (3 Rem. & Bal. Code, § 4971-8), provides:

"Blank petitions for circulation in precincts where registration of voters is not required shall bear certificates, in lieu of those contained in the foregoing forms, to be signed by a justice of the peace, road supervisor, member of a school board or a postmaster, to the effect that he resides in the precinct, naming it, and is acquainted with the legal voters thereof and that he believes the signatures opposite which he has written his initials are the signatures of legal voters of such precinct."

The duty and power of the local certifying officers is prescribed by § 10 of the law (3 Rem. & Bal. Code, § 4971-10), as follows:

"Every initiative and referendum petition, before it is filed with the secretary of state as hereinafter provided, shall be filed with the officer having custody of the registration books containing the signatures, addresses and precincts of the registered voters of the city, town or precinct, as the case may be, where the persons who have signed such petition claim to be legal voters. Upon the filing of any such petition it shall be the duty of such officer to forthwith compare or cause a deputy to compare the signatures, addresses and precinct numbers on such petition with said registration books. The officer or deputy making the comparison shall place his initials in ink opposite the signature of those persons who are shown by the registration books to be legal voters, and shall certify upon the last signature sheet of such petition that the signatures so initialed are the signatures of legal voters of the State of Washington, and shall sign such certificate and attach thereto the seal of the registration officer, if such officer have a seal, and return such petition to the person filing the same upon demand. The omission to fill any blank shall not prevent the initialing or certification of any name, if sufficient information is given to enable the officer, by a comparison of the signatures to identify the voter. Every such petition bearing the signatures of persons residing in precincts where registration of voters is not required, before it is filed with the secretary of state, shall be submitted to and initialed and certified by a justice of the peace, road supervisor, member of a school board or a postmaster residing in such precinct in the form provided in section 8 of this act."

Upon the filing of the petitions with the secretary of state, his duty, in so far as it relates to his canvass and count of . the names thereon, is prescribed by § 15 of the law (3 Rem. & Bal. Code, § 4971-15), as follows:

"The secretary of state shall . . . proceed to canvass and count the names of certified legal voters on such petition. If he find the same name signed to more than one petition he shall reject both names from the count. . . ."

There is no other language in the law referring in terms to the duties of the secretary touching his "canvass and count" of the names upon the petitions certified by the local certifying officers, or touching his duties so far as they re-

late to his determination of the sufficiency of the petitions so far as the number of signatures of legal voters thereon is concerned. If the petitions seek the submission of an initiative measure to the voters and are sufficient as to number of valid signatures thereon, the secretary's duty, following his canvass and count, is prescribed by § 19 of the law (3 Rem. & Bal. Code, § 4971-19), as follows:

"If such . . . initiative petition for submission to the people shall be found sufficient, the secretary of state shall at the time and in the manner he certifies to the county auditors of the various counties the names of candidates for state and district officers certify to each county auditor the serial numbers and ballot titles of the several initiative . . . measures to be voted upon at the next ensuing general election . . ."

Section 17 of the law (3 Rem. & Bal. Code, § 4971-17), provides for review of the decision of the secretary, upon the question of the sufficiency of the petitions as to the requisite number of signatures thereon, in the courts, as follows:

"Any citizen who shall be dissatisfied with the determination of the secretary of state that the petition contains or does not contain the requisite number of signatures of legal voters may, within five days after such determination, apply to the superior court of Thurston county for a citation requiring the secretary of state to submit said petitions to said court for examination, and for a writ of mandate compelling the certification of the measure and petition, or for an injunction to prevent the certification thereof, as the case may be, which application and all proceedings had thereunder shall take precedence over other cases and shall be speedily heard and determined. No appeal shall be allowed from the decision of the superior court granting or refusing to grant the writ of mandate or injunction, but such decision may be reviewed by the supreme court on a writ of certiorari sued out within five days after the decision of the superior court, and if the supreme court shall decide that a writ of mandate or injunction, as the case may be, should issue, it shall issue such writ direct to the secretary of state; otherwise, it shall dismiss the proceedings, and the clerk of the supreme court shall

forthwith notify the secretary of state of the decision of the supreme court."

Section 1, art. 2, of our constitution as amended in 1912 (see Laws 1911, p. 136), guaranteeing the right of initiative and referendum to the people, prescribes the basis for determining the requisite number of signatures of voters upon petitions, and, also, in a measure, other details as to the time and place of filing petitions and manner of submitting such measures to the voters or to the legislature, as the case may be. These provisions we need not further notice here, since no question is involved calling for their examination in detail; but it is worthy of note, and that we keep in mind as we proceed, that these initiative and referendum provisions of our constitution are all embodied in one section, which contains these words: "This section is self-executing, but legislation may be enacted especially to facilitate its operation." It was in compliance with this language that the legislature passed the act of 1913, the material portions of which we have above reviewed, declaring, in the title of that act, that it is "to facilitate the operation of the provisions of § 1 of art. 2 of the constitution relating to the initiative and referendum." Thus there is strongly suggested, in the language of the constitution and this law, a required liberal construction, to the end that this constitutional right of the people may be *facilitated*, and not hampered by either technical statutory provisions or technical construction thereof, further than is necessary to fairly guard against fraud and mistake in the exercise by the people of this constitutional right.

Upon the canvass and count of the names upon the petitions by the secretary, he rejected from the petitions for each of these five initiative measures several hundred names appearing thereon as petitioners, upon the sole ground that such names were forged and fraudulent. All of these rejected names were duly certified by the proper local certifying officers to be "signatures of legal voters," in such manner and form as to duly evidence, as the law prescribes, the decision

and determination of that fact by such local certifying officers. The secretary's decision in rejecting these names was in the main affirmed by the decisions of the superior court, though Judge Claypool rejected from the petitions many more names upon this ground than did Judge Mitchell. The secretary and the superior court evidently arrived at the conclusion that these names were fraudulently signed to the petitions, largely from an inspection and comparison of the hand-writing in which small groups of names appeared. These groups consisted, apparently for the most part, of two names containing the same surname, as if a husband might have signed with his own name and that of his wife, or the wife signed with her own name that of her husband, though many other names were considered by the court and the secretary to have been signed in the handwriting of the same person. However, the grounds of the decisions of the secretary and of the superior court upon the question of the fraudulent signing of these names, and the rejection thereof by them, we regard as of no consequence whatever here, since we have arrived at the conclusion that neither the secretary nor the superior court had any power to determine that these names were not the valid signatures of legal voters, that question having, by express provision of the law, been committed for decision to the specified local certifying officers, and there being no provision whatever in the law authorizing a review of their decision by the secretary. He having no such power of review, the superior court cannot have; in any event, in this proceeding, it being manifest, as we view the law, that it is the rulings and decisions of the secretary on questions which are within his power to decide, and none other, that the courts are authorized to review.

We will now notice, in order, what we conceive to be the limitations upon the power of the secretary and the court in this respect. In approaching the question of the power of the secretary and of the courts in determining questions arising incidental to the submission of an initiative measure to

the voters, it is to be remembered that we are dealing with a political and not a judicial question, except only in so far as there may be express statutory or written constitutional law making the question judicial. Speaking generally, it may be said that the legislature might have committed wholly to administrative officers all questions arising under the law incidental to the submission of initiative measures to the people, without any right of review in the courts whatever, except, possibly, pure questions of law. The determination of the number of valid signatures upon an initiative petition, as we view it, calls for the application of the same general principles of law as in the determination of the number of votes cast at an election, so far as the power of such determination is concerned. In the early case of *Parmeter v. Bourne*, 8 Wash. 45, 38 Pac. 586, 757, the late Chief Justice Dunbar, speaking for this court, held that the superior court has no jurisdiction of the subject-matter of an action which seeks to enjoin the removal of a county seat on the ground of fraud committed in an election determining such question, resting the holding upon the ground that the question was purely political, and the determination of the result of such an election being committed by law to administrative officers (in that case the county commissioners), the courts, in the absence of express statute, could not review the determination of such officers. Among the numerous authorities there cited and reviewed in support of this doctrine by the learned chief justice, we find quoted with approval the language of Justice Campbell of Michigan in *Hipp v. Supervisors*, 62 Mich. 456, 29 N. W. 77, as follows:

"The questions are not such as the courts have any right to disturb after they have been disposed of by the only authority which the law has empowered to act upon them. The supervisors, at a meeting when all the towns were represented, by a two-thirds vote, ordered an election to determine upon the proposed removal of the county seat. This election was held, and the board determined the result upon a canvass. That action is conclusive, and no authority exists anywhere

to dispute it. The controversy, which is not in any proper sense a judicial one, is closed. The constitution has not empowered this court to settle controversies not judicial, which are very wisely left to the proper local and representative agencies of the people."

This doctrine was adhered to in *Heffner v. Board of County Commissioners*, 16 Wash. 273, 47 Pac. 430, where Justice Anders, speaking for the court, observed in conclusion as follows:

"It appearing that the commissioners have 'received and compared' the returns, and have found, and properly certified to, the facts which the statute expressly submitted to them for determination, we feel constrained to accept their decision as conclusive upon the courts."

Later decisions of this court plainly show that this doctrine has not been departed from in this state. *Nichols v. School District*, 39 Wash. 137, 81 Pac. 325; *Quigley v. Phelps*, 74 Wash. 73, 132 Pac. 738; *Mann v. Wright, ante* p. 358, 142 Pac. 697; 15 Cyc. 393.

This being the law touching the power of the courts to review and control the actions of canvassing officers, it must logically follow that canvassing officers, possessing only statutory powers, cannot review or ignore, in making their canvass, determinations made by local officers upon questions expressly committed to them for decision by statute, when the statute does not give to such canvassing officers any power to review or ignore such determinations. This is the theory upon which it is generally held that the duties of canvassing officers are ministerial, preventing them from going behind the returns the statute imposed upon them the duty of canvassing, in the absence of statutes authorizing them so to do.

In *State ex rel. King v. Trimbell*, 12 Wash. 440, 444, 41 Pac. 183, Chief Justice Hoyt, speaking for the court, said·

"That the duty of canvassing boards is purely ministeria. and confined to tabulating and ascertaining the result of an election as shown by the face of the returns properly made out by the election officers is well established upon both rea-

son and authority. The election laws place the responsibility of determining the result at each election precinct upon the election officers and leave to the canvassing board only the duty of ascertaining the result from the returns made by such officers."

See, also, McCrary, Elections (4th ed.), §§ 261, 262.

Our attention is called to several decisions of the courts, including our own, which, it is insisted, show that the situation here presented is not controlled by this doctrine in so far as the power of the secretary is concerned. We will now notice these decisions, so relied upon by counsel who insist that these names be rejected from the petitions.

In *Hindman v. Boyd*, 42 Wash. 17, 84 Pac. 609, it was held that it was the duty of the city council to determine the qualification of the signers of a petition for the submission of charter amendments to a vote of the people of the city. The alleged applicability of this decision to the situation here involved finds an answer in the language of Justice Hadley, speaking for the court therein, as follows:

"The statute provides no method for determining the qualification of the petitioners. It must follow, therefore, that it lies with the city council, whose action in the premises is invoked, to determine that question in some reasonable manner, and within a reasonable time. Clearly the statute does not intend that the council shall submit the amendment until the fact exists that the necessary number of qualified voters have petitioned. Some one must determine that fact, and under the statute it must lie with the council to pass upon it in the first instance. It is generally held, under similar statutes, that it is the duty of the body to whom petitions for the submission of questions to the voters are presented to carefully scrutinize, examine, and determine as to the number and qualification of the signers before putting the people to the expense of an election. *Ayres v. Moan*, 34 Neb. 210, 51 N. W. 830, 15 L. R. A. 501; *La Londe v. Board of Supervisors*, 80 Wis. 380, 49 N. W. 960; *Dutten v. Hanover*, 42 Ohio St. 215; *State v. Eggleston*, 34 Kan. 714, 10 Pac. 3."

This is but the application of a general rule where no special provision is made by statute for the determination of the qualifications of the petitioners as voters by some specified officer or officers other than the officer or body to whom the petition is addressed, for action thereon. The authorities there cited plainly so show.

In *State ex rel. Chealander v. Carroll*, 57 Wash. 202, 106 Pac. 748, it was held, under a charter provision limiting the right to file declarations of candidacy to those persons "who shall be eligible" for the office sought, that the city comptroller had power to inquire into the eligibility of the candidate so offering to file his declaration, and refuse to file and certify the same if he be in fact ineligible, the comptroller being the officer whose duty it was to receive, file, and act upon such declaration of candidacy, and no other officer being authorized to determine the question of the candidate's eligibility.

In *State ex rel. Mohr v. Seattle*, 59 Wash. 68, 109 Pac. 309, it was held that the city comptroller was the proper officer to verify the signatures to a petition seeking submission to the voters of an ordinance under the referendum provisions of the city charter, reading:

"The city comptroller shall verify the sufficiency of the signatures to the petition and transmit it, together with his report thereon, to the city council at a regular meeting not less than (20) days after the filing of the petition. The city council shall thereupon provide for the submitting of said ordinance . . . to the vote of the qualified electors for ratification or rejection, . . ."

there being no other provision of law or charter touching the question of who was the proper officer to verify the signatures to the petition. At page 73, Chief Justice Rudkin, speaking for the court, said:

"The charter provides that that officer shall verify the sufficiency of the signatures to the petition, and imposes no duty whatever upon the city council, except to submit the

question to the voters for approval or rejection, at a general or special election on the comptroller's report."

Thus, it was held, in substance, that the council could not review or ignore the decision of the comptroller on the question committed by the charter to him for decision, to wit, the genuineness of the signatures as being those of qualified voters. Just as the power of the council was there limited by the authority conferred on the comptroller, so is the power of the secretary here limited by the express power the statute confers upon the local certifying officers to determine the question of the names upon the petitions being the signatures of legal voters.

In *State v. Olcott*, 62 Ore. 277, 125 Pac. 303, and *State ex rel. Hill v. Olcott* (Ore.), 135 Pac. 902, the supreme court of Oregon held that the secretary of state is charged with the official duty in the first instance to determine whether the signatures upon initiative and referendum petitions are signatures of legal voters, though we are unable to see from the language of these decisions that the power of the secretary in this respect was therein challenged. However, the Oregon law does not provide for the verifying and determination of the genuineness of the signatures as being those of legal voters, by any other official than the secretary, as ours does. It is true that, under the Oregon law, the petitions are to be verified in this respect by an accompanying affidavit of a private individual to the effect: "I believe that each [signer] has stated his name, post office address, and residence correctly, and that each signer is a legal voter of the state of Oregon." But that is not an *official* determination of the genuineness of the signature, nor of the qualification of the signer as a legal voter. So far as applicable to this question, the following decisions, relied upon by counsel seeking the rejection of these names, are distinguishable from the cases before us in this same way: *Woodward v. Barbur*, 59 Ore. 70, 116 Pac. 101; *In re Initiative Petition No. 23*,

35 Okl. 49, 127 Pac. 862; *State ex rel. Topping v. Houston,*
94 Neb. 445, 143 N. W. 796.

We have noticed that the whole duty of the secretary is
prescribed, so far as his canvass and count of the names is
concerned, in these words of the statute: He shall "proceed
to canvass and count the names of certified legal voters on
such petition. If he find the same name signed to more than
one petition, he shall reject both names from the count."
Having in mind an elementary rule of statutory construc-
tion, the special authority here given the secretary to reject
duplicate signatures upon different petitions of itself sug-
gests almost conclusively a limitation of power on the part
of the secretary to reject names for any other cause, when
they are determined to be "signatures of legal voters" by
the local certifying officers, and such determination is evi-
denced by such officers' certificate in the manner prescribed
by the law. If it be necessary to look for a reason for con-
ferring this special power upon the secretary, it may be
readily found in the fact that he is the first officer to whom
all the petitions are presented together when is furnished the
first opportunity of determining the number of such duplicate
signatures, if any, upon *different* petitions. It is significant
that it is "the same name signed to more than one petition"
that the secretary is especially authorized to reject. Why
this special authorization to reject this certain class of fraud-
ulent signatures, which manifestly is not within the province
of the local certifying officer to reject, since he certifies only
that the signatures upon a particular petition are the "sig-
natures of legal voters," if he so determines them to be?

Section 12 of the law provides:

"The secretary of state upon any such petition being sub-
mitted to him for filing shall examine the same, and if upon
examination said petition appear to be in proper form and
to bear the requisite number of signatures of legal voters,
.  .  .  the secretary of state shall accept and file said peti-
tion in his office; otherwise, he shall refuse to file the same,

. . ." Laws 1913, p. 424, § 12 (3 Rem. & Bal. Code, § 4971-12).

While the word "petition" is here used in the singular, it manifestly means all of the petitions assembled as one, since the secretary so deals with them. Section 13 of the law (3 Rem. & Bal. Code, § 4971-13), provides for review of this preliminary decision of the secretary touching the filing of the petition in his office, should he refuse to file the petition, in the courts. No question is raised here involving this preliminary decision of the secretary. He accepted and filed all of the petitions tendered for these initiative measures. Our attention is directed to this portion of the law in connection with that portion above reviewed, relating to the final decision of the secretary and review thereof in the courts, with a view of inducing such a construction of the law as a whole as will broaden the field of inquiry of the secretary upon his final determination touching the sufficiency of the petition and the number of valid signatures thereon, so as to include the question of the names upon the petition being "signatures of legal voters." The argument seems to be that, unless it be held to be the legislative intent that the power of the secretary is not thus broadened, there would have been no provision for this preliminary decision touching the sufficiency of the petitions as to the number of signatures. We cannot assent to this view. The preliminary inquiry and decision of the secretary is manifestly only tentative. The questions he is then to consider and decide in a mere preliminary tentative way are the same questions he is to decide upon a more thorough and detailed examination of the petitions. The legislative thought manifestly was to provide an expeditious manner of review and correction of any erroneous decision made by the secretary touching both the filing of the petitions, if he should refuse to file them, and also, thereafter, the submission of the measures to the people. Here are two stages at which the will of the people might be defeated by an erroneous decision of the secretary.

This, we think, is simply a method of providing for a speedy remedy in each of these instances. We think it manifest the legislative intent was to not have the question of the right to merely file the petitions hampered by anything more than a superficial examination of them, such as could be readily and quickly made by the secretary. But this, we think, is not a convincing argument that the secretary's inquiry upon his final determination is broadened to include the decision of questions expressly committed for decision to the local certifying officer, when no review of such decision is provided for. The situation may be likened to that confronting a court in a case presenting the question of a preliminary injunction and thereafter a permanent injunction or the refusal thereof. The jurisdiction of the court, so far as the scope of its inquiry is concerned, is not different in the two instances, the only difference being that the first is a preliminary decision more or less tentative, rendered so by the necessities of such cases, while the last is final.

It is insisted that the word "canvass" as here used in connection with the duties of the secretary to "scrutinize, examine, and determine," using the language of learned counsel for the opponents of the measures, makes his duties much more than merely to count the names upon the petition, and that, unless we hold he has power to determine the question of the names upon the petition being the "signatures of legal voters," we will unduly limit the meaning of the word "canvass" as used in connection with the secretary's duties. We may concede that the word canvass is well expressed in the words "scrutinize, examine, and determine," but scrutinize, examine, and determine what? The answer is, the things which the law has committed to his determination, not the things which the law has expressly committed to the decision of other officers. Counsel seem to think that to withhold from the secretary the power to decide the question of the names upon the petition being the "signatures of legal

voters," there is nothing of consequence left for him to scrutinize, examine, and determine. Even if this were true, we think it would not be a convincing argument in favor of holding the secretary's power broad enough to authorize him to decide questions expressly committed for decision to the local certifying officers. But the assumption, we think, is not correct. For instance, the secretary is expressly authorized to reject a name "signed to more than one petition." This surely authorizes him to scrutinize and examine the petitions incident to the determination of that question. The same may be said of other questions he may be called upon to decide, such as the genuineness of the signature of the certifying officer, the forging of such officer's initials opposite to petitioner's name, and the sufficiency of the certifying officer's certificate as to form and substance, as well as other questions which might be suggested. Several of these very questions were in fact decided by the secretary in his "canvass and count" of the names upon these petitions. Manifestly, in the light of these plain duties of the secretary, it becomes wholly unnecessary to look further for duties for him to perform in order to give to the words "canvass and count" full force and effect.

We have seen that objection by appeal to the courts must be taken within five days following the secretary's decision upon the sufficiency of the petition as to the number of signatures. His decision upon the petition for initiative measure No. 9 was that there were fourteen valid signatures thereon in excess of the required 31,836. Relator Sims appealed therefrom to the superior court. Lucy Case, representing the advocates of this measure, was permitted to intervene in the superior court. In doing so, she set up the claim that the secretary had erroneously rejected from the petitions for this measure several hundred names, upon the sole ground that such signatures were forged and fraudulent. This objection in behalf of the advocates of this measure came more than five days after the secretary's decision, but promptly

after the case came into the superior court. It is now contended that this objection cannot be considered because coming too late by reason of the five-day limitation of the statute. We think the answer to this contention is found in the fact that the advocates of this measure had no occasion to appeal to the courts from the decision of the secretary upon this or any other ground, since his decision as a whole was favorable to their position and would result in placing the measure before the people, if unreversed. · That the advocates of this measure had the right to be heard in court in opposition to the contentions of its opponents, we think must be conceded. Their rights in court were, in substance, those of defendants and, we think, such as to entitle them to have offset against any errors which might have been committed by the secretary in favor of submitting the measure, any errors which he might have committed tending to defeat the submission of the measure. The fact that this objection on behalf of the advocates of the measure is put forward merely by way of defense, we are of the opinion renders the five-day limitation prescribed in the statute wholly inapplicable thereto; and if the secretary erroneously rejected these names from the petitions for this measure, the advocates have the right to have them now restored thereto, to make up for any deficiencies which might have occurred by reason of the rightful rejection of names by the secretary.

We conclude that the secretary of state is without authority to inquire into or decide the question of the names upon the petitions being the "signatures of legal voters," in the light of the express provisions of the statute committing that question for decision to local certifying officers, and that when a local certifying officer has decided that names upon the petition are the signatures of legal voters, and has evidenced his decision by proper certificate in the manner provided by law, his decision is absolutely final so far as the power of the secretary of state to ignore or review the same is concerned.

It is contended that, even though the secretary of state is bound by the decision of the local certifying officers on the question of the names upon the petition being the signatures of legal voters, the superior court is not so bound, but may review the question upon appeal from the secretary. Viewing the proceeding in the superior court as, in substance, an appeal from the secretary's decision, as it may well be argued the statute contemplates, it is difficult indeed to see how it involves errors of either law or fact committed by any other officer than the secretary. Viewed in such light, it is quite clear that the proceeding would be to correct his rulings and decisions if erroneous, and not those of any other officer or officers. Treating the proceeding in the superior court as an original action therein, there might be furnished some ground for contending that the court's inquiry could extend beyond the questions to be decided by the secretary. In *In re Initiative Petition No. 23, supra,* the court seems to have entertained the view that the proceeding was in the nature of an original action, under a review statute similar to ours. We have already noticed, however, that this is a political question, purely so, in so far as questions of fact are involved, and that the courts have jurisdiction over it only in so far as statute or written constitutional law prescribes. The Oklahoma court was not confronted with an express statutory provision committing the decision of the question of the names upon the petitions being the "signatures of legal voters" to any special officer or class of officers. It was not confronted with any statutory provision providing for an official determination of such question by local administrative officers with no provision for review of their determination, as is provided for in this statute. But that court was reviewing, by express statutory authority, the decision of the secretary of state of Oklahoma upon matters including this very question, the court proceeding upon the theory that it was one of the questions within the secretary's power to decide under their statute. We think this court

proceeding limits the court's inquiry to questions the secretary has power to decide, and his errors.

Some contention is made against the finality of the determination of the local certifying officers, rested upon the fact that there seems to be no special provision of the law requiring such officers to return their certificates to the secretary. We are of the opinion, however, that this does not change the fact that such local officers' decisions are their official acts and decisions, and that their certificates are the prescribed official evidence of their decisions. In this connection, some contention is also made against the finality of the decisions of the local certifying officers in nonregistration precincts. This apparently is rested upon the fact that the prescribed form of the certificate for such officer to make is that he "Is acquainted with the legal voters thereof [a precinct] and that he believes the signatures opposite which he has written his initials are the signatures of legal voters of such precinct." The argument seems to be that, because the decision of such local officer is expressed in the form of belief, its force and effect as an official decision is lessened. We are unable to agree with this view. In its last analysis, that is all that the decision of any court or tribunal amounts to. The official determination of a question by a court or tribunal is but the conclusion which he or it believes to be the correct one. In the vast majority of cases, it can of necessity amount to nothing more. We are of the opinion that the determinations made by local certifying officers, as prescribed by this law, have all the force and effect of official determinations of such officers, whether they relate to registration or nonregistration precincts.

The penal provisions of this law are very severe; set forth in detail and with manifestly great care. They are directed to the signers of petitions, the certifying local officers, and even those who circulate petitions soliciting signatures thereon for pay. So far as safeguarding the operation of a law by severe and painstaking prescribed penal provisions is con-

cerned, this law has been, we think it safe to say, seldom exceeded in this respect. Among other provisions therein we find, in §§ 31 and 32 (3 Rem. & Bal. Code, §§ 4971-31, 4971-32), the following:

"Every person who shall sign any initiative or referendum petition provided for in this act with any other than his true name shall be guilty of a *felony*. Every person who shall knowingly sign more than one of such petitions for the same measure or who shall sign any such petition knowing that he is not a legal voter or who shall make on any such petition any false statement as to his place of residence, and every registration officer who shall make any false report or certificate on any such petition shall be guilty of a *gross misdemeanor*. . . . every person . . . who shall for pay or any consideration, compensation, gratuity, reward or thing of value or promise thereof, circulate or solicit, procure or obtain or attempt to procure or obtain signatures upon any initiative or referendum petition; or who shall pay or offer or promise to pay, or give or offer or promise to give any consideration, compensation, gratuity, reward or thing of value to any person to induce him to sign or not to sign, or to circulate, or solicit, procure or attempt to procure or obtain signatures upon any initiative or referendum petition . . . shall be guilty of a *gross misdemeanor*."

Section 5 (3 Rem. & Bal. Code, § 4971-5), provides that warning as to these penalties be printed on every petition. Surely these provisions evidence an intent on the part of the legislature to make them the only safeguards looking to the prevention of fraud, forgery, and corruption, in the exercise of this constitutional right by the people, except in so far as the legislature has provided for correction of erroneous rulings and decisions by officers having to do with the execution of the law. The question being inherently political, the legislature had the right, and evidently intended to provide, these penal provisions as the sole safeguards for the proper operation of the law, except wherein it has specifically provided other safeguards. The legislature might well have concluded that the possibility of fraud and wrong on the

part of signers and local certifying officers, and the possibility of invalid signatures thereby getting upon the petitions, was not of such consequence as to call for other safeguards and sanction of the local certifying officers' decisions than these penal provisions of the law. Clearly the legislature was not required to go further, and we think it has not done so. We conclude, in view of these considerations, that the superior court had no power to review the determination of the local certifying officers upon the question of the names upon the petition being the signatures of legal voters, when so decided and evidenced by the certificates of such officers, as the law requires. The decisions we have above cited and reviewed we think lend all the support necessary to this conclusion.

A large number of names upon the petitions were initialed by the local certifying officers in common lead pencil instead of ink, as the statute in terms provides they shall be. These names were rejected by the secretary. Both judges of the superior court reversed the secretary upon this point, and counted the names so initialed. It is contended by counsel for the advocates of the measure that the law is only directory upon this subject, and that the initial by pencil by the certifying officers is a substantial compliance therewith; while counsel for the opponents of the measure contend to the contrary, and that these names should be rejected. The general rule of construction, determinative of whether any particular provision of the statute is mandatory or directory, is well stated in the text of 36 Cyc. 1158, as follows:

"A provision of course is mandatory which is declared by the statute itself to be so. When a particular provision of a statute relates to some immaterial matter, as to which compliance with the statute is a matter of convenience rather than substance, or where the directions of a statute are given merely with a view to the proper, orderly, and prompt conduct of business, the provision may generally be regarded as directory."

This law contains no provision declaring that the initialing by means other than ink renders a signature upon the petition so initialed invalid. In 2 Lewis' Sutherland's Statutory Construction (2d ed.), § 611, the learned author observes:

"There is no universal rule by which directory provisions may, under all circumstances, be distinguished from those which are mandatory. Where the provision is in affirmative words, and there are no negative words, and it relates to the time or manner of doing the acts which constitute the chief purpose of the law, or those incidental or subsidiary thereto, by an official person, the provision has been usually treated as directory. Generally, it is so; but it is a question of intention. Where a statute is affirmative it does not necessarily imply that the mode or times mentioned in it is exclusive, and that the act provided for, if done at a different time or in a different manner, will not have effect. Such is the literal implication, it is true; but since the letter may be modified to give effect to the intention, that implication is often prevented by another implication, namely, that the legislature intends what is reasonable, and especially that the act shall have effect; that its purpose shall not be thwarted by any trivial omission, or a departure from it in some formal, incidental or comparatively unimportant particular."

In *Duncan v. Shenk*, 109 Ind. 26, 30, 9 N. E. 690, it is said:

"It is also a well recognized principle of statutory construction, that election laws are to be liberally construed when necessary to reach a substantially correct result, and to that end their provisions will, to every reasonable extent, be treated as directory rather than mandatory."

See, also, McCrary, Elections (4th ed.), 227; *Willeford v. State*, 43 Ark. 62; *State ex rel. Mullen v. Doherty*, 16 Wash. 382, 47 Pac. 958, 58 Am. St. 39.

Our attention is called to our decisions in *State ex rel. Czerny v. Superior Court*, 70 Wash. 592, 127 Pac. 207, and *State ex rel. McCauley v. Gilliam*, ante p. 186, 142 Pac. 470. These decisions, however, deal with statutes which are

in express terms in the particular involved declared to be mandatory. In the *Czerny* case, the statute expressly provided: "No signature shall be valid unless the above requirements are complied with." In the *McCauley* case, the statute expressly provided: "Until such statement is filed the officer shall refuse to receive such petition," referring to the required filing of a statement in connection with a recall petition. Of course, those provisions are mandatory, and a failure to do the things required by the express terms of the statute was fatal.

In *State ex rel. Waggoner v. Russell*, 34 Neb. 116, 51 N. W. 465, 33 Am. St. 625, 15 L. R. A. 740, there was involved the validity of a ballot marked by the voter with a cross in pencil, when the statute in terms provided that "the elector . . . shall prepare his ballot by marking in the appropriate margin or place a cross (X) with ink opposite the name of the candidate of his choice . . ." The statute contained no provision declaring a ballot so marked in pencil void. The court held the statute directory in this regard, and the marking of the ballot by pencil to be valid, entitling the voter to have it counted. The question is there ably reviewed at considerable length. The following decisions, relating to particular cases, support this view: *Montgomery v. Henry*, 144 Ala. 629, 39 South. 507, 1 L. R. A. (N. S.) 656, dealing with statutory required numbering of ballots in ink where ballots were left unnumbered; *Perkins v. Bertrand*, 192 Ill. 58, 61 N. E. 405, 85 Am. St. 315, dealing with statutory required initialing of ballots where only one initial is used, the statute requiring the indorsement of election officials' "initials" thereon; *Truelsen v. Hugo*, 87 Minn. 139, 91 N. W. 434, dealing with statutory required initialing of ballots where they were left uninitialed by the election officers; *McClelland v. Erwin*, 16 Okl. 612, 86 Pac. 283, dealing with statutory required stamping of a cross by the elector upon his ballot to evidence his choice where he marked a cross with a pencil; *Slenker*

*v. Engel*, 250 Ill. 499, 95 N. E. 618, dealing with a ballot marked with a broken pencil or some similar instrument which left only an indentation mark of a cross upon the paper but no color. We conclude that the statute is directory to the extent that initialing in lead pencil is a substantial compliance therewith, and that the names upon the petition so initialed, when otherwise properly certified, should be counted.

Section 9 of the law (3 Rem. & Bal. Code, § 4971-9), provides that the petition shall consist of sheets "with numbered lines for not more than twenty signatures on each sheet." There is no other provision of the law touching the question of the manner of signing the petitions. A number of sheets in these petitions contained more than twenty names on them, resulting in names not being upon the numbered lines. Many names were rejected by the secretary because of this irregularity. The decision of the secretary upon this point was affirmed by Judge Claypool and reversed by Judge Mitchell. We think the provision of the law prescribing the form of petitions, in so far as it relates to the number of lines thereon, is directory, in so far as it may be considered as thus prescribing the number of signatures that must be upon the petition. What we have already said upon the question of directory statutory provision we think is decisive of this question in requiring these rejected names to be counted.

Names were rejected from a number of the petitions by the secretary because the local certifying officers initialed blank lines thereon where no petitioner's name appeared. The secretary seems to have proceeded upon the theory that this initialing of blank lines was of itself such conclusive evidence of fraud on the part of the certifying officer as warranted the rejection of all names upon petitions where the initialing of blank lines occurred, especially where such initialing occurred upon several blank lines. It is conceded that there was no other evidence of fraud touching these pe-

titions.  Judge Mitchell reversed the decision of the secretary upon this point, while Judge Claypool affirmed his decision.  We are constrained to hold that the names upon such petitions which were duly initialed and certified should not be rejected because of this initialing of blank lines on such petitions.  It is suggested that this involves a question of fact as to which the secretary's decision is conclusive, in the absence of fraud or manifest bad faith on his part, with which he is not charged here.  On the contrary, his good faith and honesty of purpose in deciding all questions presented to him is freely conceded by all concerned.  While we may concede that the decision of the secretary upon a question of fact, in the absence of fraud or bad faith on his part, is conclusive upon the courts, we are nevertheless of the opinion that the mere fact of excessive initialing as here shown must be held, as a matter of law, not of sufficient weight as evidence to warrant the conclusion that the initialed and certified names upon such petitions were fraudulently or illegally initialed by the local certifying officers. We conclude that these initialed names should be counted where otherwise properly certified by the local certifying officers.

Finally, we conclude that there should be restored to these initiative petitions, and treated as valid certified signatures of legal voters thereon, the names which have been erroneously rejected therefrom, belonging to the classes we have above noticed and discussed, to wit:

(1)  Names rejected as being forged and fraudulently signed to petitions which are duly certified by the local certifying officers as the "signatures of legal voters."

(2)  Names initialed in lead pencil by the local certifying officers and otherwise duly certified by them to be the "signatures of legal voters."

(3)  All names on sheets of the petitions containing more than twenty names, some of the names not being on the lines, which names are properly initialed and otherwise duly cer-

tified by the local certifying officers to be the "signatures of legal voters."

(4) Names on petitions containing initialed blank lines, in so far as such names are duly initialed and otherwise properly certified by the local certifying officers to be the "signatures of legal voters."

The number of such signatures so rejected, when restored to the several petitions, will, in our opinion, result in making the number of valid signatures upon each of the following petitions for initiative measures in excess of the required 31,836, to wit:

(1) The petition for initiative measure No. 7, relating to the bureau of inspection.

(2) The petition for initiative measure No. 8, relating to employment agencies.

(3) The petition for initiative measure No. 9, relating to first aid to injured workmen.

(4) The petition for initiative measure No. 10, relating to public highways.

The number of the four classes of rejected signatures we have discussed, when restored to the petition for initiative measure No. 12, relating to the tax commission, will not, in our opinion, furnish that petition with sufficient valid signatures to make the total valid signatures thereon equal to the required 31,836. Our opinion touching the insufficiency of the petitions as to the number of signatures thereon for this measure is influenced to a considerable extent by the presumption which, of course, prevails in favor of the correctness of the decision of the secretary and the superior court. We may say that there is room for argument upon this question for and against the rejection of certain names originally upon this petition, other than those which our conclusions above set forth would restore thereto. As we are of the opinion that the decision we might arrive at touching the other questioned names upon this petition would not result in making the total of the names upon the petition equal the

required 31,836, we deem it unnecessary to further pursue our inquiry touching this petition, and the necessity of haste forbids that we take further time for discussion relative thereto.

Since our decision is to be given effect through direct communication thereof to the secretary of state, instead of through the usual remittitur to the superior court, *it is ordered* that the secretary of state submit to the voters, as required by law at the general election of the present year, initiative measures No. 7, relating to the bureau of inspection; No. 8, relating to employment agencies; No. 9, relating to first aid to injured workmen, and No. 10, relating to public highways. The clerk of this court is directed to notify the secretary of state of this decision, in compliance with the concluding language of § 17 of the law.

CROW, C. J., ELLIS, MOUNT, and FULLERTON, JJ., concur.

MAIN, J. (dissenting)—I am unable to concur with the view expressed in the majority opinion that the finding of the local certifying officer is final and conclusive and not subject to review. What may be the scope of the power of the secretary of state is not involved in these cases. The causes are here for review upon judgments of the superior court. When either the proponents or the opponents of a measure are dissatisfied with the action of the secretary of state, they may bring the matter before the superior court for a trial and determination. Upon this trial the court has the power to determine all questions of law and fact that may arise, the same as in any other action. The statute provides that, by certiorari, the judgment of the superior court may be reviewed by this court. To determine the questions presented upon the various measures which are involved would require a detailed examination of the record in each case. This would consume possibly a week's time and unnecessarily delay the decision, since the majority opinion would prevail in any event.

Gose, J. (dissenting)—The majority opinion is predicated upon what I conceive to be two fundamental errors.  First, that the certificate of the certifying officer, if it substantially conforms to the requirements of the statute, has absolute verity and finality ; and second, that neither the secretary of state nor the courts have the power to purge the petitions of fraudulent signatures.

Both the secretary of state and two trial judges, after an exhaustive and painstaking examination of the petitions (the latter aided by an expert in handwriting), have found that the petitions are honeycombed with fraudulent signatures. With these signatures eliminated, most of the petitions are short of the number required by the constitution to place them before the people, and yet the majority say, in effect, that a fraudulent petition is cleansed of its sins if properly certified, and that the people are without recourse other than to enforce the penal provisions of the statute.  I cannot acquiesce in so monstrous a doctrine.  In its last analysis, it means that one man can collude with a certifying officer, if he can find one sufficiently corrupt, write sufficient names upon the petition to satisfy the mandate of the constitution, have it certified, and that neither the secretary of state, who is charged with expending the public money in placing the measure before the people, nor the courts, may go behind the return and proclaim and condemn the fraud.  It is a rule of universal application that an interpretation of a statute which leads to absurdities should be avoided.  As was aptly said by Judge Claypool in an opinion filed in the court below, "People who propose to make new laws are not wronged by being required to observe the laws already in existence." Fraud in the initiation of a law to be submitted to the people is as ugly and unclean as fraud in a contract, and all courts hold that a contract conceived in fraud may be avoided by the party who has been defrauded.  The parties who have been defrauded in the case at bar are the taxpayers from whom the money has been taken to place before the people an initia-

tive measure which is short of the constitutional number to authorize it to be submitted, except by counting the fraudulent signatures.

Recurring to the constitutional amendment which authorizes the initiative and referendum (Laws 1911, p. 136, § 1, subd. a) we find that "ten per centum, and in no case more than fifty thousand, of the legal voters shall be required to propose any measure by such petition." Subdivision d provides that "this section is self-executing, but legislation may be enacted especially to facilitate its operation." To facilitate its operation how? Obviously by requiring all petitions to be signed by the constitutional number of legal voters. The number of legal voters fixed by the constitution for placing an initiative measure before the people for adoption or rejection is an express limitation upon the power to legislate by the initiative.

The legislative branch of the government has appropriated $300,000, or as much thereof as may be necessary, to be used by the secretary of state in paying the expenses of "clerk hire, postage, transportation and printing necessarily incurred in carrying out the provisions of the statutes with reference to the initiative and referendum and the recall of elective public officers of the state." Laws 1913, p. 417.

Laws 1913, p. 418, prescribes the method of initiating and submitting proposed measures to the people. Section 8 provides, among other things, that petitions for circulation in nonregistration districts may be certified by "justice of the peace, road supervisor, member of a school board or a postmaster, to the effect that he resides in the precinct, naming it, and is acquainted with the legal voters thereof and that *he believes* the signatures opposite which he has written his initials are the signatures of legal voters of such precinct." Section 11 provides that when the "signatures of legal voters" equal to the minimum number fixed by the constitution have been obtained, the petition may be submitted to the secretary of state for filing in his office. Section 12 provides that the secretary

of state, upon any such petition being submitted to him for filing, shall "examine the same, and if upon examination said petition appear to be in proper form and to bear the requisite number of signatures of legal voters," shall "accept and file" the same if presented within the time limited by the statute. Section 13 provides for a review by the court if the secretary of state shall refuse to "file any such initiative or referendum petition when submitted to him for filing." It further provides that, upon final hearing, if the court shall determine that the petitions are "legal in form and apparently contain the requisite number of signatures, and were submitted for filing within the time prescribed in the constitution," it shall require the same to be filed by the secretary of state as of the date of its submission. It further provides that the decision of the superior court may be reviewed by this court upon a writ of certiorari, and that if the supreme court shall decide the petitions are "legal in form and apparently contain the requisite number of signatures of legal voters, and were filed within the time prescribed in the constitution" it shall require the secretary of state to file the petition. Section 15 provides that, after the petitions have been filed, the secretary of state shall forthwith, in the presence of at least one person representing the advocates and one person representing the opponents of the proposed measure, should either desire to be present, proceed to "canvass and count the names of certified legal voters" on such petition; that if he finds the same name signed to more than one petition he shall reject both names from the count, and that if, at the conclusion of the "canvass and count," it shall appear that such petition bears the requisite number of names of "certified legal voters," the secretary shall cause the same to be submitted to the people in the method provided by the statute. Section 17 provides that any citizen who shall be dissatisfied with the determination of the secretary of state that the petition "contains or does not contain the requisite number of signatures of *legal voters*" may apply to the superior

court of Thurston county for a citation requiring the secretary to submit the petitions to the court for examination. It further provides that the decision of the superior court may be reviewed by this court upon a writ of certiorari. We have italicized portions of the statute for the purpose of emphasizing the legislative intent.

When these several sections are read in the light of the constitutional mandate fixing the minimum number of signatures which shall authorize an initiative measure to go before the people, the view is compelling that the legislature intended to devolve upon the secretary of state the duty of expunging fraudulent signatures. Recurring to the provisions of § 8, it will be remembered that, in nonregistration districts, the officer named is only required to certify that he is acquainted with the legal voters of his precinct, "and that he believes the signatures" to be the signatures of legal voters of the precinct. It was apparent to the legislature that, in most instances, the certifying officer in such precincts could not know the signatures of one per cent of the electors residing in his precinct. In view of this fact, it seems preposterous to assume that the legislature intended to give finality to such a certificate. It may be said in passing, that most, if not all, the fraudulent signing occurred in nonregistration precincts. If the majority view is correct, §§ 15 and 17 of the law, to which I have adverted, accomplish no practical purpose. If the legislature had intended what the majority say it intended, it would have provided that the secretary of state should, upon the presentation of the petitions, examine them, first, to see that they had the requisite number of signatures, second, to see that they were certified in substantial conformity with the statute, and third, for duplications, and if, after eliminating the duplicate signatures, there remained enough names properly certified to meet the mandate of the constitution, he would have been required to file the petitions and take the requisite steps to submit the measures to the people. With the ma-

jority view, it was useless for the legislature to require two
counts and to provide for two reviews by the court.   It seems
to the writer that the purpose of the legislature is appar-
ent.   In the first instance, before the filing, the secretary of
state was merely required to make a cursory examination to
ascertain if the petition appeared to be in proper form and
appeared to bear the requisite number of signatures of legal
voters.   If it did, it was his duty to file the petitions.   In
such case, if he refused to file the petitions, the court, upon
proper application, simply determined whether the peti-
tions were legal in form and apparently contained the requi-
site number of signatures.   I adopt the view of the majority
as to the meaning of the word "canvass;" that is, that it
means to "scrutinize, examine, determine" whether the pe-
tition contains the requisite number of *legal* voters regularly
authenticated; not as the majority assume, the number of
"*certified legal* voters," so authenticated.   If this interpre-
tation is not sound, why did the legislature change from the
words "appear to be in proper form and bear the requisite
number of signatures" in § 8 to the words "canvass and
count" in § 15?   I think the legislature intended, in the light
of the constitution and the statute as a whole, to require the
secretary of state to determine whether the petitions were
signed by the requisite number of legal voters, which carried
with it the power, not only to expunge duplicate signatures,
but fraudulent signatures as well.

This view is in harmony with the decisions of this court
as I read them.   I think the majority have misconstrued our
decisions in county seat and other like cases.   In *Mann v.
Wright*, *ante* p. 358, 142 Pac. 697, a county seat case, we
said:

"It will appear from a reference to these cases that we
have held the submission of a proposition to change a county
seat to be a political or a public question; that, in the ab-
sence of a statute giving the courts jurisdiction of such mat-
ters, the courts will not interfere with the determination of

the board of county commissioners where the order of sub-
mission is fair upon its face, except in cases of fraud or
arbitrary action such as was present in the *Rickey* and
*Krieschel* cases."

In *State ex rel. King v. Trimbell,* 12 Wash. 440, 41 Pac.
183, relied upon in the majority opinion, this court said, in
reference to the duty of canvassing boards:

"That the duty of canvassing boards is purely ministerial
and confined to tabulating and ascertaining the result of an
election as shown by the face of the returns properly made
out by the election officers is well established upon both rea-
son and authority."

These petitions were not fair upon their face. A most
casual inspection will show that in many instances one person
signed two or more names. This is not only apparent from
an inspection, but the fact that names were so signed was
shown by the expert witness in the court below, and not met
by the adverse party.

In *State ex rel. Chealander v. Carroll,* 57 Wash. 202, 106
Pac. 748, the relator filed in the office of the city comptroller
a written declaration of his candidacy for a public office, in
harmony with the direct primary law. The comptroller re-
fused to recognize him as a candidate, or to cause his name
to be placed on the ballot. The relator sought to compel
the comptroller by mandamus to place his name on the ballot.
There was no statute or charter provisions authorizing the
comptroller to inquire into the eligibility of a candidate for
public office who had filed his declaration of candidacy. The
primary law limited the right to file a declaration of can-
didacy to those persons "who shall be eligible," to the office
sought. After adverting to the fact that the comptroller
was charged with the expenditure of public money, we held
that he had a right to inquire into the eligibility of a can-
didate, and that where the act to be performed involved, as
it did there, the expenditure of public money, his duty to
inquire had "almost the form of a mandate."

The findings of the secretary of state, an administrative officer, upon questions of fact are final except for fraud, and no fraud or arbitrary action is claimed. Indeed, it is admitted that the secretary acted in the utmost good faith. *Sinnes v. Daggett*, 80 Wash. 673, 142 Pac. 5; *Doty Lumber & Shingle Co. v. Lewis County*, 60 Wash. 428, 111 Pac. 562, Ann. Cas. 1912 B. 870; *Blumauer v. Mann*, 72 Wash. 429, 130 Pac. 491.

We have uniformly held that a public officer will not be compelled to do an illegal act. *State ex rel. Osborne, Tremper & Co. v. Nichols*, 38 Wash. 309, 80 Pac. 462; *State ex rel. Gorman v. Nichols*, 40 Wash. 437, 82 Pac. 741; *State ex rel. Baker River & S. R. Co. v. Nichols*, 51 Wash. 619, 99 Pac. 876; *State ex rel. Socialist Labor Party v. Nichols*, 51 Wash. 79, 97 Pac. 1087.

In *State ex rel. Hill v. Olcott*, 67 Ore. 214, 135 Pac. 95, 902, a referendum case, the court emphasized the fact that no attack was made upon the genuineness of any signatures. In holding that the statute put the duty upon the secretary of state to determine whether the signatures were genuine and regularly authenticated, the court said that, in view of the fact that the genuineness of the signatures was not questioned, the secretary of state was justified in filing the petition, and that it was "much influenced in this conclusion by the fact that it is the duty of the defendant (the secretary of state) in his official capacity, to determine in the first instance by an inspection of the petition whether the signatures are genuine and are regularly authenticated." A like principle was announced in *State ex rel Halliburton v. Roach*, 230 Mo. 408, 130 S. W. 689. In *In re Initiative Petition No. 23*, 35 Okl. 49, 127 Pac. 862, it was held that such petitions are presumptively valid, and that this presumption can only be overthrown by proof of fraudulent, arbitrary, or other unlawful conduct in securing signatures. We are in hearty accord with this view. The petitions came before the secretary of state presumptively valid, but the law put the

duty upon him to ascertain, in so far as he could, whether the signatures were genuine, and whether they were certified in substantial conformity with the statute.

I cannot agree with the majority in its view that § 17 of the act limits the trial court and this court to a review of the errors committed by the secretary of state. It seems to me that this view entirely overlooks the language of this section. At the expense of repetition, I again quote its provisions:

"Any citizen who shall be dissatisfied with the determination of the secretary of state that the petition contains or does not contain the requisite number of signatures of legal voters may . . . apply to the superior court of Thurston county . . . for a writ of mandate compelling the certification of the measure and petitions . . . which application . . . and all proceedings had thereunder, shall take precedence over other cases, and shall be speedily heard and determined."

The inquiry is, What shall be speedily heard and determined? The answer is found in the statute itself; that is, whether the petition "contains or does not contain the requisite number of signatures of legal voters." My view is that the superior court is bound by the decision of the secretary of state on questions of fact, in the absence of fraud, to the same extent that it is bound by the findings of the public service commission, by the board of equalization, or by any other quasi judicial or administrative officer. If this view is not correct, then the superior court proceeds *de novo*, as was held in the Oklahoma case, and may determine the facts as in any other case. The superior court is a court of general jurisdiction, and when it takes cognizance of a case it takes it for disposition conformably to the statutes of the state and the general law. If it be a sound interpretation of the statute that the words "certified legal voters" mean all names certified to be legal, then it follows that the legislature had a purpose in omitting the word "certified" in § 17, and that purpose was to put the duty upon the superior court to determine whether

a given petition in fact contained the requisite number of signatures of "legal voters."

I find no evidence in the statute of an intention to give finality to the certificate of the certifying officers. If the statute is reasonably susceptible of that interpretation, then, in my opinion, it would clearly be unconstitutional, because a dissatisfied citizen, at some time and some place, has the constitutional right to have it determined whether the petition contains the requisite number of names of legal voters as fixed by the constitution before the initiative measure may be submitted to the people.

In conclusion, I think, first, that the certificate of the certifying officer only presumptively gives validity to the signatures; second, that it was the duty of the secretary to purge the petitions of all fraudulent signatures; third, that his findings upon questions of fact, in the absence of fraud or arbitrary action, are conclusive; fourth, that if this interpretation be unsound, the statute in terms confers this power upon the superior court of Thurston county; and fifth, that, if it did not, the superior court of Thurston county, being a court of general jurisdiction, when it took cognizance of the case, had the power to take evidence upon the question of fraudulent signatures, and expunge from the petitions all signatures which it found to be fraudulent.

For these reasons, with great respect to the opinion of the majority, I dissent.

CHADWICK, J. (dissenting)—When I was called upon to sit in this case, I had not read the briefs, and I felt that it would not be right to take time to study the statutes and the opinion at the time it came to me, inasmuch as the majority had signed it. Accordingly I said:

"It is imperative that the opinion in this case be filed this afternoon. I did not sit with the judges who heard the cases in the first instance. A majority has signed the opinion and it would do no good for me to hold it until I can give the case the attention it requires. As soon as it is possible for me to

do so, I will go into the case as thoroughly as I can and will then express that opinion which in my judgment governs the cases."

I have made some examination of the law and of the record, and it is my judgment that the statute makes the secretary of state the canvassing officer, with power to inquire and to determine whether the petitions have been signed by a requisite number of legal voters; that, in the absence of any challenge, his certificate is final; but if challenged, his judgment is subject to review by the superior court; that the superior court has power to inquire *de novo* and to make findings.

It seems to me that Judge Gose's analysis of the statute is unanswerable, but I rather agree with the second ("fourth" and "fifth") of his alternatives, which, as I understand, is in accord with Judge Main's opinion.

It would serve no purpose to review the statute or the decisions relied upon, and I shall not do so except to say that the decisions of this court, known as the county seat cases, are, in my judgment, not in point, for this reason: in those cases, the act sustained was the act of a tribunal established by law and working under the sanction of an oath, an oath to maintain the constitution and laws of the state of Washington. The county commissioners were, in a sense, a canvassing board, whereas the person who certifies the petitions in nonregistration districts under the initiative law is not an officer of the state of Washington and his declaration of opinion should be no more final than the certificate of the judges and inspectors at a general election. There is nothing other than his declaration to give credence to his certificate. He has taken no oath binding him to observe the law he is called upon to execute. Any other construction leaves the provision requiring a canvass of the vote without any life or meaning.

The effect of the decision of the majority is that fraud can stalk rampant through the courts, which are established to maintain justice. I am unwilling to hold any such doc-

trine. The legislature was careful to say that no less than a certain number of valid signatures should be on the petition. It was not the intent of the people, when the constitutional amendment was adopted, that any other rule should prevail. We are not passing on the merit of the proposed laws. The fraud in these cases is not denied. The forgeries are so numerous and so glaring and they speak so loudly that no man would have the hardihood to deny their existence. The good faith and findings of the secretary and the court are not questioned. It is not insisted that the petitions contain a sufficient number of legal signatures. Proponents admit all these things, but they say, and the court finds, that the law is helpless; that, inasmuch as the petitions are in form sufficient, we cannot inquire into their substance. I do not believe that the law is helpless. The legislature has not legalized fraud and perjury and forgery, and courts should not do so.

The rule relied upon by the majority is sound but I believe it is misapplied. It does not fit into the four corners of this case. It is a rule arbitrary in its nature, and was adopted by the courts to do justice and not to work injustice; to preserve harmony between the several departments of government. It is a rule which prevents a court from inquiring into the motives and discretion of officers when collaterally attacked, when charged with the execution of the powers of other coordinate branches of the government. It is never applied where the law provides for a direct attack, as I believe it has in this case.

The distinction between the rule adopted by the majority and the applicable rule was observed by this court in the case of *Rickey v. Williams*, 8 Wash. 479, 36 Pac. 480. The court there said:

"The granting of the writ in this case did not involve an inquiry into any matter which rested in the discretion of the board, nor into any disputed question of fact. It was not an interference with the legislative branch of the govern-

ment in any sense, but rather was in aid of legislative action. The legislature only authorized the board to submit the question in case the petition specified was filed, and then the board *must* submit it. If the board should arbitrarily refuse to act where, under the undisputed facts the law required them to proceed, the courts would unquestionably compel them to act. No other branch of the government could compel action, and if the courts have not jurisdiction in such a case the legislature is powerless and the law simply a dead letter."

The converse of this must follow. That is, where the law says that the question shall be submitted only upon a petition containing a sufficient number of legal signatures, and the fact is admitted that there is not a sufficient number of legal signatures, the court should restrain the proceeding. If it is not so, then indeed is the legislature powerless to preserve the sanctity of such proceedings and the law is a dead letter.

If a man forges a signature to a check or to a note, it has no legal life for it is conceived in fraud. If this court should hold that such a note or check were good if it had the certificate of a confederate that he believed it to be the signature of the party whose name was attached to it, we would meet the just criticism of all men. I can see no difference between such a case and the one at bar except that the case at bar may have less to excuse the fraud. Those who circulate and certify these petitions are voluntary agents acting under a deep moral obligation to the state. They are exercising in the highest degree a public function. If they return forged petitions, no pecuniary gain results to them, but the state suffers a loss in the lowering of its moral standards.

With the fact admitted that the petitions do not contain a sufficient number of legal signatures, it seems to me that the court has made a mistake in searching for precedent and authority to sustain them. The initiation of laws by petition is a new thing. It stands unrelated to any other sub-

ject of the law's concern, and instead of looking for authority that has been applied to cases where courts have said they would not review the discretion of public officers, we have a rare opportunity to say that, with the adoption of new ideas, we will declare a rule founded in the doctrine of common honesty regardless of precedent. If there be no authority or precedent for holding tight to the doctrine of honesty in all public affairs, then I say, as I have said twice before (*Mazetti v. Armour & Co.*, 75 Wash. 622, 135 Pac. 633, 48 L. R. A. (N. S.) 213; *Weber v. Doust, post* p. 668, 143 Pac. 148), it is high time that we make a precedent.

There is only one test and that is, an honest petition containing a sufficient number of legally qualified voters. Can any one doubt what the attitude of proponents would be if they were opposing, rather than promoting, these measures? If the other side were here with a petition reeking and dripping with fraud, would they not insist that the parties who certified the fraud could not purify it so as to pass the inspection of canvassing officers and of the courts? Will proponents deny that they would be here asserting that the measure proposed be sustained by reference to the doctrine of common honesty and that the name of every petitioner should be the truthful expression of every one who signed it? It may be admitted that there are thousands of names of good honest men on the petitions, but that is not enough. The people themselves have fixed a certain limit of ten per cent of the legal voters; and before the petition can be voted on, it should have the requisite number of legal signatures. To hold the contrary, is to nullify the limit fixed by the people. If this procedure is upheld, we would have to allow a petition actually signed by one or one hundred men, if there were a sufficient number of fraudulent names to make up the number required and these certified in form.

Something was said in oral argument about progressive measures. To sustain fraud and forgery is not a proper test of progress. Progress stands for honesty. To take a

petition acknowledged to be fraudulent by counsel and by every member of this court and purify it by judicial breath is retrogression in its worst form. The people are demanding that the courts shall look to the justice of the case and abstain from technical constructions. It is my opinion that no case has ever been before this or any other court where justice has been so clouded by a technicality.

I have no fault to find with my brothers who have signed the majority opinion. They are as sincere in their opinion as I am in mine. I believe they have misconceived and misapplied the law.

I have written my opinion of the proceedings attending the preparation and filing of the petitions in these cases so that when the legislature is convened it will know that it has been judicially held that certified fraud is legal fraud; that its former act has no gates to shut out frauds and forgeries and that the citadel of truth and honesty that it undertook to build around the constitutional amendment permitting and encouraging direct legislation is a house of cards.